Timothy YIELDING and Samuel C. Yielding *v.* CHRYSLER MOTOR CO., INC.

89-253                                                    783 S.W.2d 353

Supreme Court of Arkansas
Opinion delivered February 5, 1990

*Gordon & Gordon, P.A.,* by: *Bart F. Virden,* for appellants.

*Rose Law Firm, A Professional Association,* by: *Phillip Carroll,* for appellee.

STEELE HAYS, Justice. Sam and Tim Yielding brought this action against Chrysler Motor Co. (Chrysler) and its dealer, Hagan's Chrysler-Dodge, Inc., (Hagan's) alleging a defective

condition in a Dodge truck which rendered it unreasonably dangerous. After a jury verdict for the plaintiffs the trial court granted a motion by Chrysler for judgment N.O.V. The Yieldings have appealed.[1] We think the trial judge ruled correctly.

In July 1985, Sam Yielding bought a new Dodge D-50 truck from Hagan's. In November the vehicle was involved in what seems to have been a minor collision with another vehicle. The truck performed satisfactorily until February 1986, when a problem with the reverse gear developed. The truck had by then been driven some 18,000 miles. Hagan's worked on the vehicle for several days and afterwards the truck would occasionally stall. In May it would not start and was again returned to Hagan's for repairs.

The truck continued to operate erratically. Yielding's mother drove the truck on May 23, 1986, and testified that on three occasions it stalled and then "shot forward," although she had not accelerated. On May 25 Sam and his brother Tim Yielding used the truck to go fishing. While driving on a dirt road, slick from heavy dew, the truck stalled and then "took off like a rocket," swerving off the road and striking a tree. Tim Yielding described the incident:

> I told Sam to give it gas, and he put it to the floor and he held it there for a second, and it finally just took off like a rocket. And when it did, he lost control of it, and it went right off the ditch on the left, no, the right, he went off to the right, and then it jerked it back up on the road. When he did, he just went right straight across the road and hit the tree.

At that point the odometer reading was 26,953. Sam and Tim sued for injuries sustained in the collision and the jury returned a verdict of $109,682., allocating fault seventy percent to Hagan's, thirty percent to Chrysler.

In reviewing the granting of a judgment n.o.v., as with a directed verdict, we will affirm only if there is no substantial evidence to support the jury verdict. *Northside*

---

[1] Hagan's initially appealed as well, but settled its dispute with the Yieldings and dropped its appeal.

*Construction Co.* v. *Huffman*, 287 Ark. 145, 697 S.W.2d 89 (1985). We review the evidence and any reasonable inferences deducible therefrom in the light most favorable to the party against whom the judgment n.o.v. was entered. *Lancaster* v. *Schilling Motors, Inc.*, 299 Ark. 365, 772 S.W.2d 349 (1989). Substantial evidence must be of sufficient force and character to compel a conclusion one way or another; it must force or induce the mind to pass beyond suspicion or conjecture. *Farm Bureau Mut. Ins. Co. of Arkansas, Inc.* v. *Henley*, 275 Ark. 122, 628 S.W.2d 301 (1982).

■ Under our product liability statute, Ark. Code Ann. § 4-86-102 (1987), a plaintiff must prove that the product as supplied was defective so as to render it unreasonably dangerous and that such defect was the proximate cause of the accident. *See Williams* v. *Smart Chevrolet*, 292 Ark. 376, 730 S.W.2d 479 (1987); *Higgins* v. *General Motors Corp.*, 287 Ark. 390, 699 S.W.2d 74 (1985). It must be shown that the product was in a defective condition at the time it left the hands of the particular seller. *Nationwide Rentals Co.* v. *Carter*, 298 Ark. 97, 765 S.W.2d 931 (1989); *Cockman* v. *Welder's Supply Co.*, 265 Ark. 612, 580 S.W.2d 455 (1979).

■ It is not necessary to establish these elements by direct proof; circumstantial evidence will suffice. Nor is it necessary to offer proof beyond a reasonable doubt. However, if direct proof is lacking, a plaintiff must negate other possible causes of the accident by a preponderance of the probabilities. *Harrell Motors, Inc.* v. *Flanery*, 272 Ark. 105, 612 S.W.2d 727 (1981).

The evidence in this case focused on a small clamp in the valve body of the transmission, referred to as an E-clip, which was found lying in the oil pan after the collision. There was proof that when an E-clip is not in place it could result in erratic shifting and, depending on which expert was testifying, cause the vehicle to stall, jerk, or lurch.

There was general agreement that the E-clip was not defective in design and that under normal driving conditions an E-clip would not become dislodged. The primary dispute related to whether the E-clip was an incorrect size or had not been properly hardened, or was incorrectly installed in the manufacturing process; or whether the problem was attributable to the

repair work performed by Hagan in February and May, or even a combination of causes.

Generally speaking, when a vehicle suddenly goes out of control while being operated, driver error is a likely cause, absent a reliable explanation in the alternative. That factor can be ruled out, however, when the circumstances are such that common experience teaches that the accident would not have occurred in the absence of a defect. That was the situation in *Harrell Motors, Inc.* v. *Flanery, supra*, when the van, which was idling in parking gear, suddenly went into reverse and pinned Flanery against a loading dock.

While we cannot say that the circumstances in this case are such that driver error can be excluded, we will agree, for purposes of this discussion, that the testimony negated the likelihood of driver error as a cause of the collision. Appellants' experts, Larry Pipes and Alton Doughty, testified that a displacement of the E-clip would cause a vehicle to stall, jerk or lurch, characteristics that were consistent, appellants urge, with their description of the truck's behavior at the time of, and prior to, the collision. While accepting that conclusion, we note that it was by no means clear that either went so far as to say that such condition would cause a vehicle to "take off like a rocket" or to "shoot forward."

But we cannot agree the evidence established a probability that the E-clip was defective when the truck left the control of the appellee, an essential constituent of proof required under Ark. Code Ann. § 4-86-102 (1987). *See Mixon* v. *Chrysler Motor Corp.*, 281 Ark. 202, 663 S.W.2d 713 (1984); *Cockman* v. *Welder's Supply Co.*, 265 Ark. 612, 580 S.W.2d 455 (1979). Appellants produced substantial evidence that the accident itself would not have caused the E-clip to dislodge and, hence, there was circumstantial evidence of liability on the part of the Hagan's or Chrysler, or both. There was evidence that Hagan's had disassembled the transmission after the truck would not go into reverse and from the testimony of James Beavers, Hagan's mechanic, the jury could have concluded the E-clip had been dislodged or affected by the transmission work. However, to attribute any liability to Chrysler, it was necessary to show that the product was defective when it left Chrysler's control—that the clip was flawed in some manner and functioned improperly because of that defect

or in conjunction with the work done on the truck by Hagan's. We find no substantial evidence to support that conclusion.

Appellants assert that Hagan's did not disassemble the transmission, a circumstance which would strengthen the probability that the E-clip was defective when the vehicle left Chrysler. However, we are unable to adopt that view of the evidence. James Beavers testified, "I pulled the pan off, pulled the transmission out and I disassembled it and put in the necessary parts to fix it." (Appendix, p. 124). Nor do the appellants take issue with that. Tim Yielding testified, "[Hagan's] took out the transmission and put in all new parts, is what they told me," (Supp. Appendix, p. 2) and "they had the transmission out, tore apart and scattered over forty acres." (Supp. Appendix p. 3.) Moreover, Beavers testified that while the transmission was disassembled, he visually inspected the E-clip and pressed it to be certain it was seated properly.

The first sign of any malfunction attributable to a dislodged E-clip did not develop until after 18,000 miles and the evidence presented showed that had there been a defect in the clip, it would have been exhibited before then. Appellants' expert theorized how a defective clip might have stayed in place that long, but stated that he would not have expected a defective clip to stay on for 18,000 miles. A similar statement was made by Alton Doughty, a mechanic who had first looked at the truck and found the E-clip dislodged. While Doughty admitted that he had stated in his deposition that it *was* possible, there was still nothing in his testimony, nor in the testimony of appellants' expert that would place a finding by the jury on this point beyond one of speculation or conjecture.

Finally, none of appellants' witnesses had examined the E-clip to see if it was in fact defective, although it was conceded that such tests could have been readily conducted. The appellee presented testimony by an expert who had examined both the clip and its mounting and found them free of any defect. He showed the clip in question, as well as a new one, to the jury and demonstrated how both fit securely on the mounting. There was nothing shown in cross-examination of the witness that exposed any weakness in this testimony.

When reviewing this evidence and any reasonable

inferences deducible therefrom in the light most favorable to the appellants, we cannot say there is evidence to induce the mind to pass beyond conjecture as to liability for a defect on the part of Chrysler. As there was no proof against Chrysler on the issue of a defect, it is not necessary to consider the question of proximate cause.

The judgment is affirmed.