CAMPBELL SOUP COMPANY *v.* Kathy Jo GATES

94-340                                889 S.W.2d 750

Supreme Court of Arkansas
Opinion delivered December 19, 1994

*Wright, Lindsey & Jennings*, by: *Roger A. Glasgow* and *Troy A. Price*, for appellant.

*Lightle, Beebe, Raney, Bell & Hudgins*, by: *A. Watson Bell*, for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Campbell Soup Company, seeks reversal of a judgment in favor of the appellee, Kathy Jo Gates, in a product liability case involving the presence of insect larvae in a Campbell's packaged food item. Campbell Soup argues that, under the evidence in the case, the trial court erred in (1) instructing the jurors that, with regard to proof of a defective condition, they could infer a defect if they found that in the normal course of events no injury would have occurred in the absence of some defect and (2) refusing to grant its motions for directed verdict. Because the evidence of Campbell's liabil-

ity was not substantial enough to warrant the trial court submitting the matter to the jury, we reverse and dismiss the judgment. It is unnecessary for us to consider the question of the jury instruction.

*Facts*

On November 4, 1991, the appellant, Kathy Jo Gates, and her mother, Mrs. Katharin Ann Gates, went shopping for groceries in the Warehouse Foods store in Searcy, Arkansas. Mrs. Gates purchased ten packages of chicken-flavored Campbell's Ramen Noodle Soup. The product consisted of dry noodles formed into block-like shapes and sealed, along with flavoring packets, in individually wrapped plastic packages. According to Mrs. Gates, she noticed nothing wrong with the packages.

After they returned home, Mrs. Gates, according to her testimony at trial, took the noodle packages out of the shopping bag, opened three of them, broke up the noodles, poured them into a sauce pan containing boiling water, and added the seasoning. When the noodles were ready, Mrs. Gates served her daughter a bowl. Kathy Jo, having eaten one helping, took a second bowl.

Kathy Jo described what she discovered after having consumed about half of the second bowl as "maggots" or "[l]ittle bitty worms with a black head." She said that "[a] lot" of them were "attached to the noodles." Kathy Jo stated that some of the vermin "were alive and some were dead" and that she saw some of them "crawling around in the noodles." After discovering the "worms," Kathy Jo "screamed and ran to the bathroom throwing up." According to her testimony, she vomited "about four or five times." Kathy Jo's mother, Mrs. Gates, testified that "I've bought macaroni and put it in and little bugs would boil to the top and I would throw them out. I've never saw anything like this before. . . . They was alive on the plate."

Mrs. Gates drove her daughter to the White County Memorial Hospital emergency room. On the way, Kathy Jo vomited twice. When she arrived at the hospital, Kathy Jo displayed a plate containing the noodles and insect larvae and requested that her stomach be pumped, but she was advised that "it would be better just [to] throw it up because it wasn't going to hurt me."

Upon leaving the hospital after about ten minutes, Mrs. Gates and Kathy Jo, acting on the suggestion of the examining physician, drove to the Warehouse Foods store where they had purchased the noodles. Kathy Jo remained in the car, and Mrs. Gates went in the store, where she spoke with John Lane, the manager, and showed him the insect larvae. Mr. Lane phoned representatives of Associated Grocers and Campbell Soup Company and subsequently removed the Ramen Noodle Soup display. Many of the noodle packages were later opened and inspected, but no evidence of insect larvae was detected, and the product was eventually returned to stock at Warehouse Foods and sold. Campbell Soup Company received no other reports of noodle contamination. The "worms" were later identified as Trogoderm beetle larvae.

On December 1, 1992, Kathy Jo Gates filed a complaint in the White County Circuit Court against Campbell Soup Company and Town and Country Grocers of Fredericktown, Missouri, doing business as Warehouse Foods of Searcy, Arkansas. She alleged negligence on the part of Campbell Soup Company in connection with the production, manufacture, and distribution of the packaging of Campbell's Ramen Noodle Soup. She further alleged negligence on the part of Warehouse Foods in its failure adequately to test and inspect the Campbell's Ramen Noodle Soup before distribution and sale. Ms. Gates also alleged a breach of warranty under Ark. Code Ann. § 4-2-315 (Repl. 1991) and a breach of warranty of merchantability under Ark. Code Ann. § 4-2-314 (Repl. 1991) against Campbell Soup Company and Warehouse Foods. The theory of strict liability set forth in Ark. Code Ann. § 4-2-318 (Repl. 1991) was asserted, and damages were sought in the amount of $49,000, including $11,962.71 in medical expenses. Ms. Gates alleged that, as a consequence of the negligence, breach of warranties, and strict liability on the part of Campbell Soup Company and Warehouse Foods, she suffered a relapse and aggravation of a pre-existing eating disorder, which required hospitalization and psychological treatment, experienced weight loss, and received an unfavorable prognosis for the successful treatment of the pre-existing condition.

Warehouse Foods filed an answer and a cross-claim against Campbell Soup Company on December 22, 1992. Campbell Soup Company, in its answer filed on December 30, 1992, adopted all

defenses available under the Arkansas Product Liability Act of 1979, codified at Ark. Code Ann. §§ 16-116-101 — 16-116-107 (1987), including the assertions that the product was neither in a defective condition nor unreasonably dangerous when it left the manufacturer's hands and that any defective condition resulted from subsequent alteration, change, improper storage and maintenance, or abnormal use by Ms. Gates, Warehouse Foods, or an unknown third party.

The suit was tried on August 31, 1993, in the White County Circuit Court. At the close of Ms. Gates's case, Campbell Soup Company moved for a directed verdict on the grounds that no evidence of fault on the part of Campbell Soup Company had been presented and that there was no basis on which the jury could infer any defect in the product at the time it left the manufacturer's hands. Counsel for Campbell Soup also pointed that Ms. Gates's proposed jury instruction on this point was improper because it would permit a jury to infer a defect in a product if they should find that, in the normal course of events, no injury would have occurred in the absence of some defect. The trial court denied the motion, saying, "Common experience tells me that [the issue of whether] it would not have occurred in the absence of a defect is a jury question." At the close of all the evidence, the trial court denied renewed motions for directed verdict. It refused, however, to allow the case to go to the jury on a negligence theory. Instead, the jury was instructed on breach of warranty and strict liability.

The jury returned a verdict on interrogatories, finding fault on the part of all parties and allocating it at forty percent for Campbell Soup, forty percent for Warehouse Foods, and twenty percent for Kathy Jo Gates. Damages were assessed at $30,000. Judgment was entered jointly and severally against the defendants on September 7, 1993, in the amount of $24,000. Although both defendants filed notices of appeal, Warehouse Foods withdrew its separately filed notice. Satisfaction of judgment with respect to Warehouse Foods was entered on December 7, 1993. Meanwhile, Campbell Soup Company pursued this appeal.

### *Directed verdict*

█ █ Campbell Soup Company preserved the issue of sufficiency of the evidence by making a motion for a directed ver-

dict at the end of Ms. Gates's case and then renewing it at the close of all the evidence. Ark. R. Civ. P. 50(e). In reviewing the denial of a motion for a directed verdict, this court views the evidence in the light most favorable to the party against whom the verdict is sought and gives that evidence its highest probative value, taking into account all reasonable inferences deducible from it. *Arkansas Kraft* v. *Cottrell*, 313 Ark. 465, 855 S.W.2d 333 (1993). The motion should be granted only when the evidence is so insubstantial as to require the jury's verdict for the party to be set aside. *Wal-Mart Stores, Inc.* v. *Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991).

If there is any substantial evidence to support the verdict, this court must affirm the trial court's denial. *Arkansas Kraft* v. *Cottrell, supra.* Substantial evidence is not present where, regarding cause, the jury is merely given a choice of possibilities requiring conjecture or surmise. *Id.* In other words, a showing of possible causes of an injury, as opposed to probable causes, does not constitute substantial evidence. *Id.*

In a product liability case, a plaintiff must prove that the product in question was in a defective condition at the time it left the hands of the particular seller. *Yielding* v. *Chrysler Motor Co.*, 301 Ark. 271, 783 S.W.2d 353 (1990). An essential element to be established under the strict liability criteria of Ark. Code Ann. § 4-86-102(a) (Repl. 1991) is that "[t]he product was supplied by [the supplier] in a defective condition which rendered it unreasonably dangerous." In the absence of direct proof that the product is defective because of a manufacturing flaw, the plaintiff must negate the other possible causes of failure of the product for which the defendant would not be responsible in order to raise a reasonable inference that the dangerous condition existed while the product was still in the control of the defendant. *Nationwide Rentals Co.* v. *Carter*, 298 Ark. 97, 765 S.W.2d 931 (1989); *Higgins* v. *General Motors Corp.*, 250 Ark. 551, 465 S.W.2d 898 (1971).

Most of our relevant strict-liability cases are concerned with automobiles, but the general principles are analogous to the present situation. For example, we held in *Yielding* v. *Chrysler Motor Co., supra*, that there was no substantial evidence to induce the mind to pass beyond conjecture that a defective transmission

clamp which contributed to an accident was flawed when it left the manufacturer's control. Moreover, we noted that there was evidence that a third party had disassembled the transmission after delivery and prior to the accident. Similarly, in *Higgins* v. *General Motors Corp., supra,* a case involving an accident that occurred when an automobile suddenly shot across an intersection when the driver stepped on the accelerator, we held that the evidence regarding defective brake hoses did not "sufficiently negate the possibility that the rupture resulted from normal wear and tear or discount other various contingencies which may have caused the rupture for which the seller could not be held responsible under a theory of strict liability." 250 Ark. at 556, 465 S.W.2d at 900.

In *Williams* v. *Smart Chevrolet Co.,* 292 Ark. 376, 383, 730 S.W.2d 479, 483 (1987), a case involving a car door suddenly opening and the plaintiff falling out, we affirmed the trial court's granting of directed verdicts in favor of Smart Chevrolet Company, the dealer, and General Motors Corporation, the manufacturer, observing that "we cannot say that when a car door suddenly flies open while the car is travelling on a gravel road at 10 miles per hour common experience tells us that it could not have happened absent a [manufacturer's] defect." Hence, this court examined the evidence to determine to what extent the plaintiff had negated other causes of the accident and held that the proof neither went beyond suspicion or conjecture nor raised a reasonable inference that the defect was the cause of the accident.

In the present case, there is no dispute that Trogoderm beetle larvae were found among the noodle packets purchased by Mrs. Gates. Still, the mere fact that the larvae were present in the packaged and prepared product is simply not enough to assign liability to the manufacturer. It must be shown that the product was in a defective condition at the time it left the care, custody, and control of Campbell Soup. Ms. Gates and her mother testified that live and dead insect larvae were found among the cooked noodles, arguing, in effect, that the mere fact of their presence is sufficient to hold Campbell Soup Company strictly liable for the contamination. Yet no other testimony established a direct link to Campbell Soup Company apart from identifying it as the manufacturer.

Indeed, Robert B. Callaway, a research microbiologist employed by the National Food Processors Association, who identified the vermin as Trogoderm beetle larvae and was familiar with the Ramen noodle manufacturing process, testified that the noodles are steamed for thirty-two seconds at 212 degrees Fahrenheit, folded into blocks, then deep fried for thirty-two seconds at 330 degrees Fahrenheit, cooled for about 100 seconds at about 100 degrees Fahrenheit, and then immediately packaged. The larvae, Mr. Calloway stated, would not be able to survive either the steaming process or the deep frying as they cannot survive temperatures exceeding 140 degrees Fahrenheit. He testified that he examined an unopened package with two small entry holes of the Trogoderm larvae stage that contained five cast Trogoderm skins. The larvae, the witness noted, can get into such a package in less than an hour if the package is in close proximity to beetle infestation. Such testimony, of course, is properly subject to evaluation by the jury in its deliberations and is not, in any event, critical to our decision on appeal.

■ Instead, the key factor is the objective chronology of the manufacture, shipment, distribution, and sale of the particular packets of noodles infested with insect larvae. The following dates and events are of crucial importance:

*September 21, 1991* — the product was manufactured in a Campbell Soup Company plant in Industry, California.

*September 23–26, 1991* — the product was shipped on pallets via trucks by a distributor (not named as a party to the tort action) to storage sites in Lima, Ohio; Paris, Texas; and Bronsanik, Louisiana.

*October 29, 1991* — Warehouse Foods of Searcy, Arkansas, received the cases of Ramen noodles from its supplier, Associated Grocers of Springfield, Missouri.

*November 4, 1991* — Mrs. Gates purchased ten packages of the product from Warehouse Foods and prepared the noodles.

Simply put, Ms. Gates did not produce substantial evidence that the insect larvae were present in the noodles when the package left the Campbell Soup Company plant. More than a month

elapsed between the dates of manufacture and purchase, during which period the product was transported by unnamed carriers from the plant in California to an intermediate storage site and then to the distributor in Missouri, who delivered it to Warehouse Foods in Searcy, where it was in stock for approximately one week prior to November 4, 1991. The larvae could have entered the packages at any point beyond manufacture — *i.e.*, during shipment, storage, or display on the shelves of the grocery store. (Our standard of review of the denial of directed verdict motions requires us to discount the possibility that the packages could have become infested under the consumer's control.)

The evidence presented by Ms. Gates in her effort to assign liability to Campbell Soup Company was, simply put, not substantial enough to negate the existence of other possibilities of sources of contamination and therefore requires the setting aside of the jury's verdict. We hold that the trial court should have granted Campbell Soup Company's motions for directed verdict.

Reversed and dismissed.