**Tennie KAPLON, Plaintiff/Appellee,**

**Leo KAPLON, Plaintiff,**

**v.**

**HOWMEDICA, INC., Defendant/Appellant.**

**No. 95–2511.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1996.

Decided May 13, 1996.

Allen C. Dobson, Little Rock, Arkansas, argued (M. Stephen Bingham and Abraham W. Bogoslavsky, Little Rock, Arkansas, on the brief), for Defendant/Appellant.

John M. Belew, Batesville, Arkansas, argued (Stephen Bilheimer, Little Rock, Arkansas, on the brief), for Plaintiff/Appellee.

Before WOLLMAN, CAMPBELL,* and MURPHY, Circuit Judges.

WOLLMAN, Circuit Judge.

In this diversity action, Howmedica, Inc. (Howmedica) appeals the district court's denial of its motion for judgment as a matter of law (JAML) or, in the alternative for a new trial or remittitur of the jury award in favor of Tennie Kaplon on her strict products liability claim. We reverse.

## I.

On December 17, 1991, Kaplon fell and fractured her right femur. Kaplon had previously had a tumor in the area where the fracture occurred, which had been treated with radiation therapy. Dr. John Lytle performed surgery on Kaplon to insert a Grosse–Kempf nail (G–K nail), described as an intramedullary nail, in the core of her femur, which was to serve as an internal splint to hold the femur in line until it healed. Following Dr. Lytle's advice, Kaplon continued to decrease the external support she was using to walk, thus increasing the weight bearing on her femur and on the nail.

X-rays taken on July 19, 1992, showed that the nail was cracking. Dr. Lytle did not make plans to remove the nail at that time, and he did not limit Kaplon's weight-bearing. In October 1992, Kaplon returned to Dr. Lytle because her leg was more painful. X-rays showed that the G–K nail had broken in an area below the break in the femur. She was told to stay off her feet for five or six weeks. Dr. Lytle still made no plans to remove the nail.

On November 16, 1992, Kaplon consulted with Dr. Bud Dickson concerning the pain in her femur. In January 1993, Dr. Dickson performed surgery on Kaplon, removing the broken components of the G–K nail and inserting a larger Alta nail. In August 1993, the pain in Kaplon's leg worsened, and it felt as though her leg was shortening. Dr. Dickson determined that Kaplon had a new spiral fracture, and on November 16, 1993, he performed additional surgery to place plates and strut grafts on Kaplon's femur.

Dr. Lytle and Dr. Dickson both testified that Kaplon's leg did not heal normally because the bone in the area of the break was pathologic and did not have the healing characteristics of normal bone because of Kaplon's previous radiation treatments. The doctors explained that Kaplon had a nonunion, which is a fracture that has not united or healed and still has movement after the time it is normally expected to have healed. The doctors explained that in the normal healing process, the forces exerted on the implant are transferred to the bone as the bone heals. Dr. Lytle testified that an intramedullary nail is not a prosthesis in the strictest sense of that term because it is designed to hold fractures in line rather than to bear the weight of the bones.

Kaplon filed this action against Howmedica, the manufacturer of the G–K nail, alleging breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, negligent failure to warn, and strict liability. Kaplon voluntarily dismissed her warranty claims and proceeded to trial on the remaining claims. At the

---

* The HONORABLE LEVIN H. CAMPBELL, United States Circuit Judge for the First Circuit, sitting by designation.

close of Kaplon's case, Howmedica moved for JAML on the negligent failure to warn and strict liability claims. The district court granted the motion as to the negligent failure to warn claim, but denied the motion as to the strict liability claim. The district court also denied Howmedica's renewed motion at the close of the evidence. The jury returned a verdict on the strict liability claim in favor of Kaplon in the amount of $300,000. The court denied Howmedica's post-trial motions for JAML, new trial, and remittitur.

Howmedica argues on appeal that: (1) the district court erred in denying its motion for JAML on the strict liability claim, in that Kaplon failed to prove that the broken G–K nail was defective or unreasonably dangerous under Arkansas law or that it proximately caused Kaplon's injuries; and (2) the district court failed to submit jury instructions that accurately reflected Arkansas law.

## II.

We review the denial of a motion for JAML de novo, applying the same standard used by the district court. *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197 (8th Cir.1995). This standard requires us to resolve all conflicts in favor of Kaplon, giving her the benefit of all reasonable inferences and assuming as true all facts supporting her which the evidence tended to prove. *See Sherlock v. Quality Control Equip. Co.*, 79 F.3d 731, 735 (8th Cir.1996) (quoting *Grand Labs., Inc. v. Midcon Labs.*, 32 F.3d 1277, 1280 (8th Cir.1994)). We will affirm the denial of the motion if a reasonable jury could differ as to the conclusions that could be drawn. *Id.* at 735. We will not set aside a jury's verdict lightly, and we will not weigh, evaluate, or consider the credibility of the evidence. *Fox v. T–H Continental Ltd. Partnership*, 78 F.3d 409, 413 (8th Cir.1996).

We first reject Kaplon's claim that Howmedica did not adequately raise in its motion for JAML the issues it argues on appeal. Howmedica argued the issues in its motion for summary judgment and raised the same issues again in its motions at trial. Howmedica's motion for JAML addressed the proximate cause issue expressly in the

context of arguing that the jury award was excessive. We find this was sufficient. *See Rockport Pharmacy*, 53 F.3d at 197–98 (technical precision not necessary in motion for JAML if trial court is aware of movant's position).

Arkansas law applies in this diversity case, and we review the district court's interpretation of that law de novo. *See Rockport Pharmacy*, 53 F.3d at 197 (citing *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991)). To state a claim against Howmedica for strict liability under Arkansas law, Kaplon must prove that: (1) Howmedica is engaged in the business of selling the G–K nail; (2) the G–K nail was supplied in a defective condition which rendered it unreasonably dangerous; and (3) the defective condition was a proximate cause of the harm. *See* Ark.Code Ann. § 4–86–102(a) (Repl.1991); *Williams v. Smart Chevrolet Co.*, 292 Ark. 376, 730 S.W.2d 479, 482 (1987). We find that Kaplon did not offer evidence to prove either the second or the third element of a strict liability claim.

Kaplon acknowledges that she relied on circumstantial evidence to show that a defect existed in the G–K nail. When relying on circumstantial evidence to prove that a defect existed, the plaintiff must negate all other possible causes of product failure for which the defendant would not be responsible. *Campbell Soup Co. v. Gates*, 319 Ark. 54, 889 S.W.2d 750, 753 (1994). Howmedica argues that Kaplon did not negate all other possible causes, as Kaplon's pathologic bone is what caused the G–K nail to break. Kaplon, however, argues that because some doctors will wait twelve months before declaring a non-union, the nail was defective because it broke at seven months. Thus, argues Kaplon, the nail was defective regardless of her abnormal bone.

There was no testimony, however, offered to show that a G–K nail is defective if it does not last twelve months. Kaplon relies primarily upon the testimony of Chris Lawler, Howmedica's manager of technical relations. When asked, "Does this product have built into it any margin of safety or over-design to

accommodate those situations where a patient might take twelve months to heal," Lawler replied, "In general, yes, we could say it has a margin of safety, yes. But you have to speak generally because every patient is unique." Lawler disputed that the medical community generally would wait twelve months before declaring a non-union. He also stressed that the life of the implant depends upon whether the bone is healing and thus whether the weight-bearing is transferred from the implant to the bone.

Neither Dr. Dickson nor Dr. Lytle testified that the nail should have lasted twelve months or that they believed the nail was defective because it did not. When asked, "You would expect the hardware to last up to 12 months," Dr. Dickson replied, "Generally speaking, I would," but later clarified his testimony by saying that his answer was dependent upon several factors and that the nail could break in a much shorter period than twelve months. Both doctors testified that the length of time a nail will last depends upon the pressures put upon it. Kaplon did not submit any expert testimony to say that G–K nails should last twelve months. Howmedica's metallurgic report showed no metallurgic defect in the nail. Howmedica's own package insert warned against weight-bearing in non-union or delayed union fractures.

We conclude that this evidence is not sufficient to support a finding that a nail that does not last twelve months is defective. Such a finding would depend upon unwarranted speculation or conjecture on matters outside the scope of the jury's experience. *See Yielding v. Chrysler Motor Co.,* 301 Ark. 271, 783 S.W.2d 353, 355 (1990) (evidence must be sufficient to "induce the mind to pass beyond suspicion or conjecture").

■ For a product to be unreasonably dangerous under Arkansas law, the product failure must be an occurrence that the reasonable buyer or user did not contemplate, taking into account any special knowledge of the buyer. Ark.Code Ann. § 16–116–102(7) (Michie 1987); *Purina Mills, Inc. v. Askins,* 317 Ark. 58, 875 S.W.2d 843, 847 (1994); *Berkeley Pump Co. v. Reed–Joseph Land Co.,* 279 Ark. 384, 653 S.W.2d 128, 132–33 (1983). Howmedica argues that because Dr. Lytle had seen nails break on prior occasions, the nail breaking was not an occurrence that he did not contemplate. Kaplon argues, however, that Dr. Lytle did not contemplate that the nail would break within twelve months of its insertion. When asked, "Would you have anticipated that the nail would have survived through Mrs. Kaplon's healing period if that could have been accomplished within a twelve month period," Dr. Lytle answered, "I did not anticipate the nail breaking." Dr. Lytle later testified, however, that he would have expected Mrs. Kaplon to heal in "[a]nywhere from two to six months." Dr. Lytle was not asked whether he had seen other nails break within twelve months of their insertion. Dr. Lytle also testified that the orthopedic community refers to the implant process as a race between implant failure and bone healing. We do not believe that a jury could find from this evidence that Dr. Lytle did not contemplate that the nail might break within seven months under some circumstances, and thus a jury could not find that the nail was unreasonably dangerous.

■ Turning to the third element of a strict liability claim, proximate cause may be proved by circumstantial or direct evidence, but the evidence must "tend to eliminate other causes that may fairly arise from the evidence," and the jury must have more than "speculation and conjecture in deciding between two equally probable possibilities." *St. Paul Fire & Marine Co. v. Brady,* 319 Ark. 301, 891 S.W.2d 351, 353–54 (1995). Howmedica argues that Kaplon's pain and suffering, her shortened leg, decreased mobility, and additional medical expenses were not caused by the G–K nail breaking. We agree. Although Kaplon's counsel argued to the jury that Kaplon would have had the plates and strut grafts inserted earlier if Dr. Dickson had not needed to replace the broken G–K nail, with the result that her second break would not have occurred, Dr. Dickson's testimony does not bear this out. Although at one point Dr. Dickson testified that he probably would have grafted the femur in January 1993 if the nail had been in place and not loose, he later clarified that the

reason he did not do the grafting procedure at that time was because he "elected not to do so, ... to err on the conservative side." When asked, "But the thing that hampered your ability to do it was the broken Grosse & Kempf nail," Dr. Dickson responded, "That's not correct, no. The reason that I did not do the graft was because I made a decision that after having put the Alta nail in and fixed the fracture, I felt like it was strong enough and would heal without doing the graft." Dr. Dickson also testified that it was the non-union and the bones rubbing together, and not the broken nail, that caused Kaplon's pain. The testimony showed that Kaplon's removal and replacement surgery was necessitated by the failure of her bone to heal—not by the broken nail. Had her bone healed, there would have been no reason to replace the broken nail. Dr. Lytle testified that neither he nor his associate believed the broken G–K nail was a problem, that they made no plans to remove it, and that his associate even believed the fracture was in a better position to heal after the nail broke. While the testimony is somewhat internally inconsistent, we do not believe that a reasonable jury could find that the broken G–K nail was the proximate cause of Kaplon's pain or injuries.

We conclude that because the jury could not reasonably find by a preponderance of the evidence that Kaplon proved that Howmedica was liable under strict liability, the district court erred in denying Howmedica's motion for JAML.

### III.

Because we find that the district court should have granted Howmedica's motion for JAML, we need not address Howmedica's contention that the district court erred in refusing its proposed jury instructions.

The judgment is reversed and the case is remanded to the district court with instructions to enter judgment in favor of Howmedica.