**BOATMEN'S TRUST CO.,**
**et al., Plaintiffs,**

v.

**ST. PAUL FIRE & MARINE**
**INSURANCE CO., et al.,**
**Defendants.**

No. J–C–97–244.

United States District Court,
E.D. Arkansas,
Jonesboro Division.

Feb. 26, 1998.

Michael M. Kinard, Kinard, Crane & Butler, P.A., Magnolia, AR, Bobby R. McDaniel, McDaniel & Wells, P.A., Jonesboro, AR, for Boatmen's Trust Company, Wiley Elbert Middleton, Kathleen Middleton Rudick, as Plaintiffs.

Paul D. McNeill, Womack, Landis, Phelps, McNeill & McDaniel, Jonesboro, AR, for St. Paul Fire & Marine Company, Defendant.

Laura Hensley Smith, Friday, Eldredge & Clark, Little Rock, AR, for William Cooper, Defendant.

T. Scott Clevenger, Clevenger, Angel & Miller, P.L.L.C., Little Rock, AR, for Chris Alkire, M.D., Defendant.

Bettina E. Brownstein, Harry S. Hurst, Jr., Wright, Lindsey & Jennings, Little Rock, AR, for BOC Health Care Inc., Defendant.

## MEMORANDUM OPINION AND ORDER

SUSAN WEBER WRIGHT, District Judge.

This is a combined products liability and medical malpractice action brought by the plaintiff Kathleen Middleton on behalf of her son, Wiley Middleton, who suffered brain damage on October 20, 1990, during an oper-

ation at Cross County Hospital in Wynne, Arkansas. The operation was performed by Dr. Chris Akire, an orthopedic surgeon, to treat a leg fracture Middleton had sustained in a motor vehicle accident. Certified nurse anesthetist William Cooper administered general anesthesia to Middleton, using an anesthesia machine manufactured by separate defendant Ohmeda, a division of BOC Health Care, Inc. ("Ohmeda").

The plaintiffs sue Cooper, Akire, and St. Paul Fire and Marine Insurance Company, insurer of the hospital, for medical malpractice, claiming that their treatment of Middleton fell below the applicable standard of medical care. In addition, the plaintiffs allege that Ohmeda supplied a defective product which was unreasonably dangerous which was a proximate cause of the injuries to Middleton. *See* Comp. ¶ 44.

Now before the Court is Ohmeda's motion for summary judgment to which the plaintiffs have responded and Ohmeda has filed a reply. The Court has carefully reviewed the motion, response, reply, briefs, statements of material fact, and exhibits, and finds that the motion should be granted.

## I.

According to the undisputed facts, the anesthesia machine in use during the operation was an Ohio model 2000 ("2000"), which was designed in 1956. The unit at the Cross County Hospital was manufactured and sold to the hospital in 1973. When sold to the hospital, it was considered to be a state-of-the-art piece of equipment. After 1973, advances were made in the delivery of anesthesia and in anesthesia equipment. Advances in anesthesia equipment were incorporated by Ohmeda into models manufactured after the 2000 was sold to Cross County Hospital. In 1980, Ohmeda ceased producing this particular model, although it continued to service those still in use.[1] In 1989, Ohmeda advised its customers, including Cross County Hospital, that in two years, it would no longer be able to continue servicing 2000 machines because of the unavailability of parts. Service on the 2000 at Cross County Hospital was discontinued in 1991. The 2000 at Cross County Hospital was in continuous use until service on it by Ohmeda was discontinued.

According to Ohmeda, the 2000 works by delivering a stream of gases into the patient's lungs through an endotracheal tube. The stream of gases consists of two carrier gases (oxygen and nitrous oxide) and the anesthetic agent, in this case, halothane. There are two flowmeters for each gas, one used to monitor the delivery of relatively high or "course" flows, and one used when relatively low or "fine" amounts are desired. Mr. Cooper testified that he adjusted the controls so that the following mixture was given his patient: 50% oxygen, 50% nitrous oxide, and .5% halothane. An hypoxic dose of gases occurs when less than 20% of oxygen is given.

The parties agree that monitors and other devices, developed after the 2000 was sold to the hospital, were available at the time of Middleton's operation to enhance the delivery of anesthesia. Mr. Cooper knew about these monitors and devices, and they could have been purchased by the hospital from Ohmeda or other manufacturers as standalone units to use with the 2000.[2] These devices included an end tidal carbon dioxide monitor and an oxygen analyzer. Also, machines newer than the 2000 with more devices and built-in monitors were available for purchase from Ohmeda at any time prior to 1990. The Link 25 or interlink[3] was first incorporated into anesthesia machines marketed in 1979. There was no governmental recall involving the 2000.

During his deposition, Cooper stated that although newer models were available, the 2000 was still serviceable, and newer equipment was not necessarily better. *See* Ex. A [Cooper Dep.] at 35–36, Br. in Supp.Mot. Summ.J. He also related that a pulse oxime-

---

1. Ohmeda states it sold 11,543 units of the 2000.

2. According to the Contract for Anesthesia Services between Cooper and the hospital, the hospital, relying on Cooper's recommendations, was responsible for obtaining any medical equipment. *See* Ex. 1, Br. in Supp.Mot.Summ.J.

3. Ohmeda describes this device as one that links the nitrous oxide and oxygen flow meters. It prevents an operator from administering a gas mixture containing less than 25% oxygen. *See* Def's. Br. in Supp.Mot.Summ.J., at 12 n. 2.

ter to use with the 2000 was purchased by the hospital at his request, but he was unable to replace the 2000 with a newer system because of hospital finances. *Id.*

Separate defendant Ohmeda asserts that it is entitled to summary judgment on the following grounds: (1) the Ohmeda anesthesia machine did not proximately cause any harm to Middleton; (2) the anesthesia machine at issue was not defective or unreasonably dangerous when sold; and (3) Ohmeda had no post-sale duty toward Middleton. In response, the plaintiffs claim that Ohmeda knew in 1989, when it notified its customers that it would no longer be able to continue servicing the machines, that such machines no longer met the standard of care for anesthesia machines in the United States and that its continued use constituted a violation of Ohmeda's duty not to allow the general public to be subjected to an unreasonably dangerous and defective piece of equipment.

### II.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inference to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

### III.

"Under our product liability statute [Ark.Code Ann. 16–116–102 (1987) ], a plaintiff must prove that the product as supplied was defective so as to render it unreasonably dangerous and that such defect was the proximate cause of the accident. It must be shown that the product was in a defective condition at the time it left the hands of the particular seller." *Yielding v. Chrysler Motor Co.,* 301 Ark. 271, 783 S.W.2d 353, 355 (1990). *Accord Campbell Soup Co. v. Gates,* 319 Ark. 54, 889 S.W.2d 750 (1994). The Act provides in pertinent part:

In determining the liability of the manufacturer, the state of scientific and technological knowledge available to the manufacturer or supplier **at the time the product was placed on the market, rather than at the time of the injury,** may be considered as evidence.

Ark.Code Ann. § 16–116–104(1) (emphasis added). The Act further provides:

Compliance by a manufacturer or supplier with any federal or state statute or administrative regulation **existing at the time a product was manufactured** and prescribing standards of design, inspection, testing, manufacture, labeling, warning, or instructions for use of a product shall be considered as evidence that the product is not in an unreasonably dangerous condition in regard to matters covered by these standards.

Ark.Code Ann. § 16–116–105 (emphasis added).

In support of its motion for summary judgment, Ohmeda points out that the plaintiffs' liability experts unanimously agree that, based on the evidence, there was no malfunction of the 2000. In addition, Ohmeda submits the deposition testimony of plaintiffs' experts, all of whom agree that the machine was state-of-the-art when sold to the hospital. Dr. Lawrence A. Wilson stated that at

the time the 2000 was sold to the hospital, he liked the machine, and the lack of an oxygen monitor or end tidal monitor or nitrous oxide fail-safe device in 1973 did not make the machine defective and inadequate at that time. *See* Ex. D [Wilson Dep.] at 167, Def's. Br. in Supp.Mot.Summ.J. Certified Nurse Anesthetist Timothy Schneider said he did not think that the 2000 was defective or unreasonably dangerous even though it had no linkage system; it just required that the operator be more vigilant. He stated that at the time the machine was sold to Cross County Hospital, it was state of the art. *See* Ex. B [Schneider Dep.] at 172–73, 175, Def's. Br. in Supp.Mot.Summ.J. Ms. Susan Phillips, a certified nurse anesthetist, stated she believed that the 2000 met the industry standard when it was manufactured and sold to the hospital. *See* Ex. C [Phillips Dep.] at 176, Def's. Br. in Supp.Mot.Summ.J.

The plaintiffs assert that there is evidence from which a jury could find that the machine was defective because it did not have a linking device. Dr. Wilson testified that possibly the lack of a linking device on the machine caused Cooper to misdial the amount of oxygen to be delivered. They point to the following testimony:

Q: What, in your opinion, occurred at the induction of anesthesia that led to the hypoxic event as you have used those terms?
A: I think there are one of two possibilities. One is an esophageal intubation. The other would be that the flow meters were incorrectly set giving too concentration of oxygen.

Wilson Dep. at 39, Pls.' Resp.Mot.Summ.J. He goes on to state:

The flow meters on that machine, it is very easy to think that you're putting on three liters of oxygen when in fact you may be only turning on 300cc. And that also would lead to a picture just like this.

. . . .

Q: In your opinion, can you, based on all you reviewed in this case, even decide between your two possibilities, the esophageal intubation or the flow meter adjustment problem or, in your opinion, are these two possibilities equally as possible in this case.
A: They're equally possible.

Q: So the problem in this case, in your opinion, could just as easily have been a flow meter adjustment problem or an esophageal intubation?
A: Yes.
Q: And you can't decide between those two possibilities?
A: No.

*Id.* at 47–8.

Dr. Wilson further stated that his opinion that it could have been a flow meter adjustment problem was based on the fact that the patient was not delivered an adequate amount of oxygen. *Id.*

The plaintiffs also point to the testimony of Schneider in which he said that beginning sometime in the 1980's, using the 2000 without a linkage device would have been below the standard of care and the 2000 would be considered defective and unreasonably dangerous. *See* Schneider Dep. at 173–74, Pls.' Resp.Mot.Summ.J. The plaintiffs also cite the testimony of Phillips, who stated her opinion that continued use of the 2000 did not meet accepted standards of care in place at the time of the surgery. She said that if the 2000 had other devices in place, such as an oxygen analyzer and a nitrous oxide fail-safe, Middleton's outcome may have been different. *See* Phillips Dep. at 174–75, 177–78, Pls.' Resp.Mot.Summ.J.

The plaintiffs argue that there is evidence from which a jury could reasonably determine that the design of the machine was defective because of the tendency to err in the adjustment. They further assert that there is another material fact in dispute as to whether or not Ohmeda knew it had a piece of equipment that was so antiquated that it gave rise to a duty on behalf of Ohmeda to recall all its old machines.

Separate defendant Ohmeda asserts that Dr. Wilson's testimony is the only evidence from which a jury could determine that the lack of a linking device on the 2000 caused Cooper to misdial the amount of oxygen to be delivered. It points out, however, that Dr. Wilson could not decide between the two possibilities, and in products liability cases, Arkansas law requires that causation be proved to a probability.

According to the deposition testimony of Schneider, the most likely cause of the lack

of oxygen to Middleton was a missed endotracheal intubation. A second cause could have been an improper mixture of nitrous oxide and oxygen. A third possible cause, according to Schneider, could have been a displaced endotracheal tube. He said he thought the missed endotracheal intubation was "95 percent likely" what happened. *See* Ex. B at 44–45. He said he mentioned an improper mixture as a possibility only because it is something that could have happened but could point to nothing in this case that could bring that theory out of the realm of general possibility. *Id.* at 167. Mr. Schneider further opined that the only explanation for air in the bowel was improper intubation. *Id.* at 168.

It was Susan Phillips' expert opinion that Middleton suffered an interruption of the flow of oxygen for a period of about five minutes when the tube dislodged from the trachea and the oxygen flowed not into his lungs but into the esophagus. She thought this probably happened when Middleton was moved from the stretcher onto the bed but could have happened as Dr. Akire was setting the fracture. *See* Phillips Dep., Ex. C at 72–75.

Dr. Wilson stated that based upon his review of an x-ray report, the only explanation for the finding of air in the bowel is an esophageal intubation. He said he thought that when Cooper first intubated Middleton, he put the endotracheal tube in the esophagus and not in the trachea. *See* Ex. D at 45. He further stated that if there was a flow meter adjustment problem, i.e. Cooper failed to adjust the gauges properly or misread the gauges, he would be critical of Cooper but he could not say to a reasonable degree of medical probability that there was in fact a meter adjustment problem in this case. *Id.* at 140–41.

Dr. Repsher, one of the plaintiffs' experts, stated that an improper adjustment of nitrous oxide and oxygen was a possibility but does not rise to the level of probability. He thought an improper adjustment was relatively unlikely and that most likely it was an airway problem. *See* Ex. E [Repsher Dep.] at 104, Br. in Supp.Mot.Summ.J. Dr. Klein, one of defendant Cooper's experts, said he thought the evidence supports some type of embolic phenomenon; that this was the most

likely diagnosis, greater than 50% probability. He stated that no other options carry enough credibility with facts to be meaningful. *See* Ex. F [Klein Dep.] at 43–44, Br. in Supp.Mot.Summ.J. Dr. Klein further stated that the equipment met minimum standards for anesthesia equipment for a hospital in October 1990 and that the 2000 was not unreasonably dangerous or defective without a fail-safe device. Id. at 116, 142. Dr. Marvin, another expert for Cooper, stated he believed the primary problem was a perfusion blood-flow rather than a ventilation-air flow problem. *See* Ex. G [Marvin] at 37, Br. in Supp.Mot.Summ.J.

■ In products liability cases, Arkansas law requires that causation be proved to a probability. In *Kapp v. Bob Sullivan Chevrolet Co.*, 234 Ark. 395, 353 S.W.2d 5 (1962), the court held that evidence on the issue of an automobile seat belt installer's negligence in improperly installing a seat belt and in failing to warn users as to its limitations was insufficient for the jury. The court found that the appellant's entire case rested

> upon conjecture and speculation. Several possible causes of the break are argued, but in truth, they are only possibilities, and do not reach the status of probabilities. Negligence cannot be established by guess work. As stated in *Henry H. Cross Co. v. Simmons*, 8 Cir., 96 F.2d 482, a decision under Arkansas law: 'To submit to a jury a choice of possibilities is but to permit the jury to conjecture or guess, and where the evidence presents no more than such choice it is not substantial, and where proven facts give equal support to two inconsistent inferences, neither of them can be said to be established by substantial evidence and judgment must go against the party upon whom rests the burden of sustaining one of the inferences as against the other.' In *Glidewell v. Arkhola Sand & Gravel Co.*, 212 Ark. 838, 208 S.W.2d 4, this Court said: 'Conjecture and speculation, however plausible, cannot be permitted to supply the place of proof' . . .

*Id.* 353 S.W.2d at 17.

In *Arkansas Kraft v. Cottrell*, 313 Ark. 465, 855 S.W.2d 333 (1993), the court held that a directed verdict should have been granted when the only evidence in support of probable cause was an allegation that it was

hot on a stairway and the steps were narrow. The court held that evidence "showing possible causes of a fall, as opposed to probable causes, does not constitute substantial evidence of negligence." In *Rogers v. Armstrong World Industries, Inc.,* 744 F.Supp. 901 (E.D.Ark.1990), an asbestos case, the court granted a motion for summary judgment on the ground that the plaintiff had not made the required showing of proximate cause. The court stated: "[A]lternative theories of liability that minimize or eliminate the need to prove causation ... have not found their way into Arkansas jurisprudence." *Id.* at 904. "Substantial evidence must be of sufficient force and character to compel a conclusion one way or another; it must force or induce the mind to pass beyond suspicion or conjecture." *Yielding, supra,* 783 S.W.2d at 355.

■ The Court finds that the evidence supporting the plaintiffs' claim that an alleged defect in Ohmeda's machine caused the mishap is not of sufficient force to create a genuine issue of fact for the jury. The theory that Cooper misset the allegedly hard-to-read dials is merely a conjectural possibility as opposed to a probability. It is clear that all of the plaintiffs' experts believe that the most likely cause of the mishap was a misplaced or displaced tube and not the delivery of too little oxygen from the machine. The Court thus finds that Ohmeda is entitled to judgment as a matter of law as there is no genuine issue of material fact in dispute as to the role the machine played in the cause of Middleton's injury.

■ In addition, the Court finds that there is no legal basis under Arkansas law to find Ohmeda liable under the theory that the machine was defective or unreasonably dangerous. The law is clear that liability is determined at the time of sale and, according to the expert testimony, the Ohmeda 2000 was an exemplary machine at the time it was designed and sold to the hospital. In fact, the plaintiffs do not dispute that the 2000 was considered to be a state-of-the-art piece of equipment when it was sold to the hospi-

tal. The Court thus finds that Ohmeda is entitled to judgment as a matter of law on the issue of defective and unreasonably dangerous product.

## IV.

■ Finally, the Court finds that the plaintiffs have no cause of action under Arkansas law involving any post-sale duty to warn. The plaintiffs cite no authority and the Court finds none to support a claim based upon a legal duty to warn. *See Smith v. Firestone Tire & Rubber Co.,* 755 F.2d 129, 135 (8th Cir.1985) (applying Missouri law, court held no duty to notify of defect or recall absent a recall order by a governmental body). As noted earlier, Arkansas law imposes liability as of the time of sale, and the parties agree that there was no government recall.

■ Further, even if a post-sale duty existed, Cooper testified that he knew about advances in anesthesia machine technology.[4] Under Arkansas law, there is no duty to warn of a danger when the danger is shown to be known or reasonably discoverable by the user who could guard against it. *Gisriel v. Uniroyal, Inc.,* 517 F.2d 699, 704 (8th Cir.1975) (while there is no duty to warn a user who knows of the danger or by whom the danger is reasonably discoverable, the product's danger must, however, be shown to have been known or discoverable). If the plaintiffs contend that the dangers were a lack of monitors or a linking device, then there can be no duty imposed on Ohmeda or any breach because it is clear that Cooper and the hospital knew of the alleged dangers and could have taken steps to correct them.

## V.

IT IS THEREFORE ORDERED that the motion for summary judgment of separate defendant Ohmeda[5] be and is hereby granted.

---

4. *See* Ex. A [Cooper Dep.] at 15, 35–36, 94. Cooper was a member of the American Nurse Anesthetist Association and received literature from this organization. He obtained yearly continuing education credits through Mt. Sinai Hos-

pital and was knowledgeable about advances in the field of anesthesiology and anesthesia equipment.

5. Docket entry 9.