Cite as 2021 Ark. App. 19

# ARKANSAS COURT OF APPEALS

DIVISIONS II & III

No. CV-18-752

| | |
|---|---|
| THERESA VIGO MIAOULIS, AS GUARDIAN AND NEXT FRIEND OF JOHNATHON E. LOPEZ, A MINOR<br>APPELLANT<br><br>V.<br><br>TOYOTA MOTOR NORTH AMERICA, INC., D/B/A TOYOTA MOTOR COMPANY; ET AL.<br>APPELLEES | Opinion Delivered: January 13, 2021<br><br>APPEAL FROM THE ST. FRANCIS COUNTY CIRCUIT COURT<br>[NO. 62CV-12-177]<br><br>HONORABLE CHALK MITCHELL, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Johnathon Lopez, then a minor, suffered severe and permanent injuries when he was ejected from the 2000 Toyota Sienna in which he was a passenger during a rollover accident. A products-liability action was filed on his behalf against several related Toyota entities[1] alleging that defective latches securing the second-row seat where Johnathon was riding "inertially unlatched" in reaction to the gravitational forces of the accident, causing both the seat and Johnathon to be ejected from the vehicle. The circuit court directed a verdict in Toyota's favor as to all of Johnathon's causes of action finding that there was no substantial evidence of proximate causation because there had only been evidence of possibilities of

---

[1]The entities are Toyota Motor Corporation; Toyota Motor North America, Inc. d/b/a Toyota Motor Co.; Toyota Motor Engineering & Manufacturing North America, Inc.; Toyota Motor Manufacturing, Kentucky, Inc.; and Toyota Motor Sales, U.S.A., Inc. (collectively, Toyota).

three different theories of why the latches failed. Johnathon's grandmother and legal guardian, appellant Theresa Miaoulis, challenges the grant of the directed verdict on her products- liability, failure-to-warn, and fraud claims. She also claims that the court erred in dismissing her claim for punitive damages. Finally, she argues three evidentiary issues that she contends may arise in the event of a new trial. We affirm.

I. *Factual Background*

Johnathon's injuries resulted from a single-car rollover accident that occurred on westbound Interstate 40 near Wheatley, Arkansas, on September 19, 2010. Johnathon's grandfather, Eddie Lopez, was driving a 2000 Toyota Sienna minivan when the Lopez vehicle and another vehicle had to take evasive action to avoid a tractor-trailer tire tread on the highway. The Lopez vehicle then swerved back to the inside passing lane and off the Interstate, swerved onto the westbound inside shoulder, and subsequently rolled into the median between the eastbound and westbound lanes of the Interstate. Johnathon was seated in a captain's seat behind the driver's seat. According to the complaint, Johnathon was injured when his seat disengaged from the floor of the vehicle, became loose and dislodged, and was thrown from the vehicle with Johnathon belted in the seat.

Suit was filed in September 2012. The operative complaint at the time of trial was the fourth amended complaint, asserting several claims against Toyota regarding the defective second-row latches, including negligence, strict liability for design defects, strict liability for failure to warn, breach of express and implied warranties, and fraud. The complaint sought both compensatory and punitive damages. The Toyota entities separately answered, denying all liability.

2

The case was tried before a jury. After Miaoulis presented her evidence and rested her case-in-chief, Toyota moved for directed verdict, both orally and in writing, and renewed the motion after it presented its case-in-chief and after Miaoulis's rebuttal evidence. Miaoulis presented written responses to Toyota's motion. During the argument on the motion for directed verdict, Miaoulis withdrew her express-warranty and fraud claims.

In its bench ruling, the circuit court granted Toyota's motion for directed verdict on all claims and dismissed the case.[2] The court found that Miaoulis had not proved a defect or proximate cause because her experts' testimony did not establish any cause of the alleged seat ejection to a probability but only suggested a range of possibilities. The court also granted a directed verdict on Miaoulis's failure-to-warn claim because she failed to establish that a different warning would have made any difference under the facts of this case. That is, Eddie Lopez, the owner of the vehicle and its driver at the time of the accident, never removed the seat and reinstalled it. The court also granted a directed verdict on Miaoulis's claim for punitive damages finding that the evidence did not prove that Toyota took any action that rose to the necessary level of culpability to impose punitive damages.

A judgment incorporating the court's comments from the bench was entered, dismissing Miaoulis' complaint with prejudice. Although Miaoulis timely filed a motion for new trial, no action was taken on the motion and it was deemed denied. This appeal followed.

---

[2]The circuit court also directed a verdict in favor of Toyota on Miaoulis's breach-of-warranty claims. She does not raise any issue on appeal about those claims.

II. *Arguments on Appeal*

Miaoulis raises five arguments in support of reversal. First, she argues that the circuit court erred in granting Toyota's motion for directed verdict because she presented substantial evidence that a design defect was the proximate cause of Johnathon's injuries. She also contends that substantial evidence established that a failure to warn of the defective seat latches proximately caused Johnathon's injuries. Miaoulis further argues that she presented substantial evidence to support her claim of fraud. She also asserts that the circuit court erred in dismissing her claim for punitive damages. Finally, she raises several evidentiary issues that she contends may arise in the event of a new trial.

III. *Standard of Review*

In deciding whether the grant of a motion for directed verdict was appropriate, appellate courts review whether there was substantial evidence to support the circuit court's decision.[3] This court views the evidence in the light most favorable to the party against whom the verdict was directed.[4] If any substantial evidence exists that tends to establish an issue in favor of that party, then a jury question is presented and the directed verdict should be reversed.[5] Substantial evidence is evidence of sufficient force and character to induce the mind of the fact–finder past speculation and conjecture.[6]

---

[3] *See, e.g.*, *Switzer v. Shelter Mut. Ins. Co.*, 362 Ark. 419, 208 S.W.3d 792 (2005).

[4] *Gamble v. Wagner*, 2014 Ark. App. 442, 440 S.W.3d 352.

[5] *Id.*

[6] *Id.*

IV. *Discussion*

For her first point, Miaoulis argues that she presented substantial evidence to establish a design defect as the proximate cause of Johnathon's injuries. She further argues that there were three separate failure modes of the same design defect and that she pinpointed inertial release as more likely than not as the sole cause of the latch failure.

To prevail in a products-liability case against a supplier, a plaintiff bears the burden of proving both (1) that the product was defective when it left the defendant's control such that it was unreasonably dangerous and (2) that the defect was a proximate cause of the injury.[7] Here, the issue is proximate cause.

Proximate cause is usually an issue for the jury to decide, and when there is evidence to establish a causal connection between the conduct of the defendant and the damage, it is proper for the case to go to the jury.[8] Proximate cause is defined as that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.[9] Of course, proximate cause may be proved by either circumstantial or direct evidence. It is, however, necessary that there be evidence that would tend to eliminate other causes that may fairly arise from the evidence and that the jury not be left to speculation and conjecture in deciding between two equally probable possibilities.[10] It is enough that the plaintiff introduce evidence from which

---

[7]Ark. Code Ann. § 16-116-101(a)(2), (3) (Repl. 2016); *Higgins v. Gen. Motors Corp.*, 287 Ark. 390, 699 S.W.2d 741 (1985).

[8]*McGraw v. Weeks*, 326 Ark. 285, 930 S.W.2d 365 (1996).

[9]*Gilbow v. Crawford*, 2015 Ark. App. 194, 458 S.W.3d 750.

reasonable persons might conclude that it is more probable than not that the event was caused by the defendant.[11]

Miaoulis's theory was that defects in the design of the seat latch caused the seat to unlatch from the vehicle during the accident, which, in turn, caused the seat belt to unlatch and resulted in Johnathon's ejection from the vehicle and subsequent injuries. Miaoulis relied on the testimony of two experts, Dr. Mariusz Ziejewski and Andrew Gilberg, regarding accident reconstruction, biomechanics, and seat-latch design.

Andrew Gilberg, an automotive engineer, testified as to whether the seat latches were defectively designed. Although he did not do an accident reconstruction or a full vehicle test, Gilberg tested seat latches, both new and used, from the Toyota minivan and its competitor. He found that the Toyota latch was the weakest he had tested requiring only minimal force to allow the handle to unlatch and release the entire seat. He concluded that the Toyota seat latches were susceptible to unwanted release in a foreseeable rollover accident. Gilberg testified that the Toyota latch would open between 40 to 50 Gs, depending on whether it was new or used. He said that this was 20 to 25 percent of the G forces the competitor's latch would resist. He said that was "completely possible to open the latch given the impacts you see in a rollover."

Gilberg testified that the releasing of the latch presented an unreasonable risk to occupants of the Toyota vehicle, especially considering that the seat had the seat-belt buckle

---

[10]*St. Paul Fire & Marine Ins. Co. v. Brady*, 319 Ark. 301, 891 S.W.2d 351 (1995).

[11]*Higgins, supra.*

6

attached to it. In Gilberg's opinion, this made the seat latch defective and unreasonably dangerous and not fit for its intended purpose.

Gilberg testified that the design of the Toyota latch allowed for "partial engagement"; the seat latch appears to be latched but is not secure. He was able to demonstrate this during his testimony. He further found that the design of the Toyota latch "promotes debris collection in the striker recess, which will lead to [a] false latch condition."

Dr. Mariusz Ziejewski, an engineering professor of vehicle dynamics and biomechanics, testified as to causation and relied on the testing conducted by Gilberg. He conducted a reconstruction of the accident. He offered three possibilities as to how the seat released, i.e., false latching of the seat latch, where the latches were believed to be latched but were not; inadvertent unlatching by something inadvertently striking the lever actuating the seat latch; and the inertial release of the seat latch by forces applied to it during the accident.

Dr. Ziejewski found debris—paper—in the striker well, supporting his false-latching theory. He also found in the vehicle a dumbbell with an indention that he said perfectly matched the lever that releases the seat, supporting his inadvertent-unlatching theory. Dr. Ziejewski found that there was enough force from the accident to cause the inertial release of the seat latch.

Dr. Ziejewski opined that Johnathon was wearing his seat belt at the time of the accident, based on the load marks on the latch plate. He said that the significant injuries occurred after Johnathon was ejected from the vehicle and struck his head. According to Dr. Ziejewski, if Johnathon had remained in the vehicle, he would have had minor or

moderate injuries such as bruising, cuts, or disc herniation due to the sudden rotation of the body.

Miaoulis argues the foregoing was sufficient proof to submit the proximate-cause question to the jury. She further argues that she presented sufficient evidence showing that inertial release of the seat was the sole cause of Johnathon's injuries. However, we conclude that, at most, her evidence would do nothing more than afford the jury a choice of possibilities of how Johnathon's seat became detached. Dr. Ziejewski testified, "I can't distinguish likelihood between the three. Either of those three modes of failure could potentially happen. All three are equally likely." When the evidence presents no more than such a choice, we have said that it is not substantial.[12] Although the circuit court relied heavily on the supreme court's decision in *Kapp v. Bob Sullivan Chevrolet Co.*[13] in directing a verdict in Toyota's favor, Miaoulis does not discuss *Kapp* until her reply brief. Like the plaintiff in *Kapp*, Miaoulis's entire case rested "upon conjecture and speculation. Several *possible* causes of the break are argued, but in truth, they are only *possibilities*, and do not reach the status of probabilities."[14] She has failed to come forward with sufficient record evidence of proximate causation that would ensure the jury would not be left to speculation and conjecture.

---

[12]*Kapp v. Bob Sullivan Chevrolet Co.*, 234 Ark. 395, 353 S.W.2d 5 (1962); *see also Williams v. Smart Chevrolet Co.*, 292 Ark. 376, 730 S.W.2d 479 (1987); *Higgins, supra.*

[13]*Supra.*

[14]*Kapp*, 234 Ark. at 415-16, 353 S.W.2d at 17 (emphasis in original).

8

The speculative nature of Miaoulis's case is clear. Dr. Ziejewski testified that "there are a number of things that have to happen to make my theory correct. . . . The accident has to happen. If the seat is ejected in the accident, the seat has to be released somehow. If Johnathon is ejected and wearing a seat belt from the beginning, the seat-belt buckle has to release." On cross-examination, Dr. Ziejewski testified that he had no physical evidence that the seat was ejected from the vehicle. He said that he relied on the testimony of the state trooper that found the seat in the middle of the median. Dr. Ziejewski also testified that "the buckle release has two possibilities," inadvertent unlatching and inertial unlatching. He could not, however, rule out the possibility that Johnathon's finger or some other object hit the button, stating "[i]n terms of the probability of either one of these, I can't tell." Dr. Ziejewski admitted on cross-examination that he agreed with Toyota's design-engineering expert that both inadvertent unlatching and inertial unlatching of the seat belt were highly unlikely.

Miaoulis also argues that she presented substantial evidence that pinpointed inertial release as the sole cause of the latch failure. She cites testimony from Gilberg and Dr. Ziejewski about the plausibility of inertial release of the seatbelt. She asserts that Gilberg opined that the seat in the Lopez vehicle would inertially release once it was subjected to the loads he tested. She also cites Dr. Ziejewski's testimony that there was more than enough energy for inertial release. However, neither Gilberg nor Dr. Ziejewski specifically opined that *this* accident was caused by inertial release of the seat. Gilberg's testimony references his deposition testimony in which it is indicated that he was asked his opinion.

Thus, the testimony Miaoulis relies on is nothing more than a *possible* cause of Johnathon's injuries.

Miaoulis further argues that she presented sufficient circumstantial evidence that the latches were defective and relies on the fact that there was an accident and Johnathon was ejected from the vehicle as circumstantial proof. However, the mere fact that an accident occurred does not establish that the product was defective.[15] We cannot say that the circuit court erred in granting a directed verdict on Miaoulis's strict-liability claim.

For her second point, Miaoulis argues that she established that a failure to warn proximately caused Johnathon's injuries. Here, vehicle owner Eddie Lopez testified that he purchased the Toyota minivan used but could not recall the date of purchase. He stated that he was unaware that he could remove the seats from the vehicle. He also said that he had never tried to adjust the seats. The circuit court dismissed Miaoulis's failure-to-warn claim because she did not establish that a different warning would have made a difference under the facts of this case.

Miaoulis makes a one-sentence argument that Eddie Lopez never testified that he did not read warning materials. Instead, her argument is that the circuit court failed to properly apply the presumption created by the supreme court in *Bushong v. Garman Co.*[16] There, the plaintiff claimed he was injured when he inhaled vapors that arose from mixing Clorox bleach with an air-conditioner coil cleaner while cleaning the bathroom floor at his employer's premises. Plaintiff filed suit against the manufacturers of both products alleging,

---

[15]*Williams*, 292 Ark. at 382, 730 S.W.2d at 482.

[16]311 Ark. 228, 843 S.W.2d 807 (1992).

among other causes of action, negligence, strict liability, and failure to warn.  The trial court granted summary judgment to the manufacturers on all of plaintiff's claims.  On appeal, the supreme court held that a failure to read a warning label does not automatically preclude a claim for inadequate warning.  Instead, the court held that once a plaintiff proves the lack of an adequate warning, a presumption arises that the user would have read and heeded adequate warnings.  This presumption may be rebutted by evidence "which persuades the trier of fact that an adequate warning or instruction would have been futile under the circumstances."[17]  The supreme court affirmed a summary judgment for the defendants because the plaintiff admitted that he had never read a label on a cleaning product during the three years he worked for his employer.[18]  The court concluded that the plaintiff's failure to read the labels precluded his claim as any warning would have been futile since he would not have read it.[19]

The circuit court's ruling is correct because the evidence established that Lopez never removed the seat.  The ruling is also consistent with the *Bushong* presumption and is, in effect, a finding that the presumption had been overcome.  Although Miaoulis attempts to distinguish *Bushong* factually because there were no warnings on the Toyota minivan, her argument simply relies on the presumption but does not explain what would have been

---

[17]311 Ark. at 234, 843 S.W.2d at 811.

[18]*Id.*

[19]*Id.*

11

different had the circuit court specifically said that the presumption applied and had been rebutted. Under the circumstances, we cannot say the circuit court erred.[20]

For her third point, Miaoulis argues that she presented substantial evidence to support her fraud claim. The parties disagree over whether this point is preserved for review. We hold that it is not properly preserved. During the argument over the motion for directed verdict, Miaoulis specifically stated that she had withdrawn her fraud claim. In its bench ruling, the circuit court noted its "understanding [that] plaintiff's fraud claim has been withdrawn" and thus did not further address that claim. After the court finished its oral ruling granting the directed verdict, Miaoulis tried to make a record and move forward with her fraud claim. The court recognized that Miaoulis was attempting to proceed with her fraud claim and extended its directed-verdict ruling to include the fraud claim. The court also kept inquiring whether the fraud claim was indeed withdrawn. No clear, specific answer was provided.

Miaoulis is making the argument concerning the sufficiency of the evidence to support her fraud claim for the first time on appeal. Her written responses to the directed-verdict motion did not mention the fraud claim. Instead, she argued strict-liability, negligence, and warranty claims in those responses. During the argument on whether the fraud claim had been withdrawn, Miaoulis admitted that the fraud issue was not briefed.

---

[20]This is also consistent with *Kapp*, relied on by the circuit court, in which the supreme court affirmed a directed verdict on the failure-to-warn claim because the court concluded that a warning as to care of the seat belts would not have made a difference because the vehicle owner testified that the belts were not damaged or misused in any way. The court also concluded that a warning as to the seat belt's limitations would likewise not have changed how the accident occurred.

12

She never specifically argued to the circuit court that she presented sufficient evidence to prove the elements of fraud. It is well settled that this court will not address an issue raised for the first time on appeal, even a constitutional argument.[21]

Because we affirm the circuit court's directing a verdict for lack of proximate cause, we need not address Miaoulis's claim that the court erred in dismissing her claim for punitive damages at the liability phase of the proceedings. Without an award of compensatory damages, there is no basis for punitive damages.[22]

Finally, Miaoulis makes several arguments concerning evidentiary issues that she contends may arise in the event of a new trial. First, she argues that the circuit court erred in prohibiting her from introducing a statement of facts that Toyota admitted were true in connection with a deferred prosecution agreement with the federal government. Second, Miaoulis claims that the court erred in prohibiting her experts from discussing a 2001 warning label and its effects on their conclusions in the case. Last, she argues that the court erred in allowing Toyota to impeach Trooper Jason Martin with a previously recorded, out-of-court statement when Martin had already admitted making the statement.

We do not address these arguments because they do not affect the sufficiency question and, as Miaoulis admits, would be of significance only if the case were remanded for another trial.[23]

Affirmed.

---

[21] *Bayer CropScience LP v. Schafer*, 2011 Ark. 518, at 9, 385 S.W.3d 822, 829.

[22] *Paulino v. QHG of Springdale, Inc.*, 2012 Ark. 55, at 16, 386 S.W.3d 462, 470.

[23] *See Higgins v. Gen. Motors Corp.*, 287 Ark. 390, 699 S.W.2d 741 (1985).

13

GLADWIN, WHITEAKER, and HIXSON, JJ., agree.

HARRISON, C.J., and MURPHY, J., dissent in part.

**BRANDON J. HARRISON, Chief Judge, dissenting**. I respectfully dissent in part from the majority's opinion in this "crashworthiness" case that involved the rollover of a 2000 Toyota Sienna, an event that tragically injured the backseat passenger several years ago.

Specifically, I disagree with the decision to affirm the circuit court's directed verdict against Miaoulis's primary product-liability claim—that Toyota's rear-passenger restraint system was defective and unreasonably dangerous. The decision is not supported by the law when correctly applied or the voluminous record when fully read. The primary product claim should have been submitted to the jury for decision. Of this I have no doubt. I am not persuaded, as the majority is, that a directed verdict is supported by one case from 1960—one which involved an entirely different make and model of vehicle, concerned an alleged defect that occurred under conditions that have no factual or scientific resemblance to the rollover in this case, and was based on expert testimony that does not even approach in volume or detail the testimony that was presented here. This case was jury bound; the circuit court erred by interrupting the process and taking the case from the jury.

As to Miaoulis's failure-to-warn claim, the circuit court's decision to direct a verdict on this record and for the reason announced is also unsupportable. The warning claim should have been presented to the jury for decision. I express no opinion on the evidentiary issues raised or on the punitive-damages issue. Finally, I agree with the majority's decision that the circuit court was legally justified in directing a verdict against Miaoulis's fraud claim.

## I.

### A. Defective Design/Unreasonably Dangerous Product-Liability Claim

Regarding Miaoulis's claim that Toyota's rear-passenger restraint system was defective and unreasonably dangerous, it is impossible to adequately summarize in a dissent all the positions on all the technical points the parties raised and do justice to their positions on the "primary" product-liability claim. The battling experts agreed on nothing. If there was any point of agreement between the parties' experts on some important historical fact or engineering principle, all of which required many thousands of pages to fully memorialize, the agreement eluded me. Issues such as biomechanics, mechanical-engineering principles, vehicle-component design, dynamic forces imparted to a Sienna during a rollover—and how it all affected (or not) a backseat passenger—were discussed at great length. Therefore, the record on file in this complicated case will have to speak for itself. Having read the record, however, I am persuaded that the circuit court should have sent the design-defect claim to the jury and let it do what it so often is tasked to do in tort cases involving disputed and minutely detailed expert-witness testimony: determine which side presented the most scientifically and factually sound, and therefore more credible, case. Consequently, I would reverse the directed verdict and remand for a new trial on the defective design/unreasonably dangerous product-liability claim.

### B. Failure to Warn

Miaoulis's failure-to-warn claim is more manageable and can be addressed here in some detail. A manufacturer of a product has a duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in its use for a purpose and in a

manner which the manufacturer should reasonably foresee. AMI Civ. 1002 (Nov. 2020 update).[1] A violation of this duty is negligence. *Id.* There is no duty, however, to warn a user of obvious dangers, those already known to him, or those that he should reasonably discover for himself. *Id.*

While the majority is correct that a plaintiff's conduct may be relevant to determining liability in a products-liability case, that was no reason to direct a verdict on Miaoulis's failure-to-warn claim. When determining the adequacy of a warning, our supreme court has held that the user must first prove the warnings or instructions provided were inadequate. *Bushong v. Garman Co.*, 311 Ark. 228, 843 S.W.2d 807 (1992). But after a user has done so, a presumption arises that the user would have read and heeded adequate warnings or instructions. *Id.* This presumption may be rebutted by evidence "which persuades the trier of fact that an adequate warning or instruction would have been futile under the circumstances." *Id.* at 234, 843 S.W.2d at 811 (quoting *Safeco Ins. Co. v. Baker*, 515 So. 2d 655, 657 (La. Ct. App. 1987)).

In *Bushong*, a man sought to recover damages for personal injury caused by inhaling gas from a mixture of bleach and another cleaner. Plaintiff Bushong admitted that he had never read a label on a cleaning product during the three years he worked at Stewart Electric.

---

[1]AMI 1002 Products Liability—Negligence—Manufacturer's Duty to Warn

A manufacturer of a (product) has a duty to give a reasonable and adequate warning of dangers *[inherent][or][reasonably foreseeable]* in its use *[(for a purpose) (and) (in a manner) that the manufacturer should reasonably foresee].* A violation of this duty is negligence. There is no duty, however, to warn a user of obvious dangers or those known to *[him][her]* or those which *[he][she]* should reasonably discover for *[himself][herself].*

16

Given that admission, our supreme court held that the circuit court did not err in ending Bushong's warning claims against the manufacturers, because any warning or instruction would not have been read by him anyway, and therefore, some other warning would have been futile. *Id.* at 234, 843 S.W.2d at 811.

Here, the Sienna owner, Eddie Lopez, said nothing like what Bushong had admitted. Lopez in no way said that he habitually chose not to read warning labels. He presented evidence that there was a lack of an adequate warning or instruction. Not only did Lopez present testimony to engage the *Bushong* presumption that he would have read and heeded adequate warnings or instructions about the Sienna's rear-seat latch, Toyota did not rebut the presumption *as a matter of law* after the presumption was triggered because it did not establish that a warning or instruction would have been futile. This means the jury should have been permitted to decide the warning claim *as a matter of fact* while being guided by the proper instructions.

In this case the circuit court relied on *Kapp v. Bob Sullivan Chevrolet Co.*, 234 Ark. 395, 353 S.W.2d 5 (1962) and ruled,

> The plaintiff in that case alleged that the seatbelt warnings were inadequate but the Supreme Court affirmed the decision, affirmed a directed verdict in favor of the defendant because plaintiff has failed to prove that additional warnings would have made any difference.
>
> This case is similar to *Kapp*. Plaintiff presented no proof that John "Eddie" Lopez, the owner of the vehicle and its driver at the time of the accident, ever removed the seat and replaced it. So a warning regarding proper installation of the seat would not have made any difference because he never installed the seat in the first place. Plaintiff presented no proof for this matter that the seat was falsely or incompletely latched at the time of the accident.

17

Plaintiff's entire case is built on speculation as to something that could have happened, not something that more probable than not happened. A warning affixed to the seat regarding proper installation would not have made any difference to a user who never installed the seat. Therefore, the Court grants a directed verdict on plaintiff's failure to warn claim.

Miaoulis argues that the circuit court erred by "inverting the legal presumption" in *Bushong* and making improper factual inferences. I agree. Miaoulis specifically asserts that the 2000 Sienna lacked an adequate warning regarding the possibility that the second-row seats could be incompletely or partially latched. Toyota's own corporate representative explained that this series of Sienna ran from 1998 to 2003 and admitted that a warning label was added in 2001. The warning was added to the Sienna after a warning label had been placed on other Toyota models—"[b]ecause the same latch mechanism was used, we wanted the latch to be properly latched. So with other design engineers, the judgment was made that it was necessary to have the label." Prior to 2001, similar content was found only in the owner's manual, which Toyota then deemed good enough. But Miaoulis's expert on safety and design, Dr. Kenneth Wayne Heathington, opined that

> they need to have a label on the seat where you can see it to what you needed to do to make sure it was going to stay locked in, and you had to clean out the -- where the little trough was and those things. But you needed—you needed signing information posted.

Dr. Heathington also confirmed at trial that during his deposition he stated to a reasonable degree of engineering certainty that "you should have a warning on the seat."

Because the 2000 Sienna did not have a warning label, we must presume under *Bushong* that a proper warning would have been heeded. Again, unlike the plaintiff in *Bushong*, Lopez did not testify that he did not read warning labels or otherwise indicate that he would not have read a proper warning had one had been placed on the rear seat. He

18

instead said that he had never removed the rear seats and did not know that they could be removed. *Bushong* requires us to presume that if a proper warning had been present, Lopez would have read it and heeded its recommendation to ensure that the rear seat was properly latched or secured—even if he never had any occasion to remove the seats.

As a closing point, it bears mentioning that Toyota never argued, and the circuit court never ruled, that the language in the 2000 Sienna operator's manual sufficed to adequately warn of the charged danger. Toyota's argument and this court's affirmation rest solely on a misapplication of the *Bushong* presumption and the failure to appreciate the lay- and expert-witness testimony associated with the warning claim. Whether the jury would have sided with Miaoulis on the argument that Toyota's conduct proximately caused an injury is of course an open question; but the jury should have been tasked with giving the answer.

A motion for directed verdict should be denied when there is a conflict in the evidence, or when the evidence is such that fair-minded people might reach a different conclusion. *Nat'l Bank of Ark. v. River Crossing Partners, LLC*, 2011 Ark. 475, 385 S.W.3d 754. This case is a prime example of an instance in which fair-minded people could reach different conclusions on material points. I would hold that the circuit court erred in granting a directed verdict on the failure-to-warn claim and grant Miaoulis a new trial on the claim.

### C. Punitive Damages & Evidentiary Points

Regarding the majority's affirmation of the circuit court's directed verdict against Miaoulis's prayer for punitive damages, I express no opinion. Nor do I express an opinion on the evidentiary issues that Miaoulis raised.

II.

To summarize my conclusions, I agree with the majority's decision to affirm the directed verdict against Miaoulis's fraud claim. But I respectfully disagree with the decisions to affirm the circuit court's directed verdicts against the primary product-liability claim and the failure-to-warn claim. A new trial should issue on them because they were ended prematurely under the law and facts presented. Like the majority, I express no opinion on any other issue Miaoulis raised in her principal brief given the circumstances. I also express no opinion on the punitive-damages issue.

I am authorized to state that Judge Murphy joins part I.B. of this dissent but otherwise agrees with the majority opinion.

*Duncan Firm, P.A.*, by: *Phillip Duncan* and *Richard Quintus*; *McKissic & Associates, PLLC*, by: *Gene E. McKissic, Sr.*; *Williams & Anderson, PLC*, by: *Heather G. Zachary*; and *Denton and Zachary, PLLC*, by: *Justin Zachary*, for appellant.

*Wright, Lindsey & Jennings LLP*, by: *Edwin L. Lowther, Jr.*, *Gary D. Marts, Jr.*, and *Baxter D. Drennon*, for appellees.