Cite as 2025 Ark. App. 55

# ARKANSAS COURT OF APPEALS
## DIVISION III
No. CV-22-822

| | |
|---|---|
| B. BRAUN MEDICAL, INC.<br><br>APPELLANT<br><br>V.<br><br>LEAH SEXTON<br><br>APPELLEE | Opinion Delivered February 5, 2025<br><br>APPEAL FROM THE CLARK COUNTY CIRCUIT COURT<br>[NO. 10CV-19-86]<br><br>HONORABLE BLAKE BATSON, JUDGE<br><br>AFFIRMED |

**RAYMOND R. ABRAMSON, Judge**

The appellant, B. Braun Medical, Inc. ("B. Braun"), seeks reversal of a judgment in favor of the appellee, Leah Sexton ("Sexton"), in a products-liability case involving contaminated medical instruments utilized in an epidural procedure during Sexton's labor and delivery. B. Braun argues that the circuit court erred in denying its motion for a directed verdict at trial. Because the evidence of B. Braun's liability was substantial enough to warrant the circuit court's submitting the matter to the jury, we affirm.

## I. *Facts and Procedural History*

On Thursday, June 29, 2017, Sexton went to Baptist Health Medical Center in Arkadelphia ("Baptist Arkadelphia") for an induction of labor in anticipation of delivering her first baby. During her labor and delivery, she was administered an epidural utilizing a custom epidural kit manufactured by B. Braun for Baptist Health System ("Baptist Health").

On Friday, June 30, she delivered a baby girl with no complications. Sexton and her baby were discharged from the hospital the next day, on Saturday, July 1.

On Sunday, July 2, Sexton began experiencing leg pain and fever. On Monday, July 3, she was seen by her obstetrician, Dr. Alexis McCollum, due to her fever and pain, which had begun to radiate to her back and hips. Sexton's symptoms worsened progressively to the point that she was no longer steady enough on her feet to carry her newborn baby or to walk any distance without the fear of falling. She ultimately experienced hallucinations and loss of bladder control and went to an emergency room later the same week. On Friday, July 7, she saw her primary care physician, Dr. Shelly Bray, for a follow-up.

Dr. Bray ordered an MRI, which showed that Sexton had developed a rare epidural abscess. Dr. Bray sent Sexton directly to Baptist Health Medical Center in Little Rock ("Baptist Little Rock"), where neurosurgeon Dr. Gautam Gandhi was waiting to perform necessary surgery on the epidural abscess. That surgery required a removal of part of Sexton's lamina bone to access the infected areas in the epidural and intradural spaces within her spine. Pathology results showed that the infection was caused by a particular bacterium, methicillin-resistant Staphylococcus aureus, commonly known as MRSA.

Sexton's late-night surgery concluded in the early-morning hours of Saturday, July 8. After the surgery, Sexton remained in ICU at Baptist Little Rock for three days. She was then transferred to a regular room for another five days before being discharged from the hospital to a rehabilitation facility to regain mobility and strength to carry her new baby. She finally returned home on July 28, nearly a month after her baby was born. Once home, she

2

continued with outpatient physical therapy but had lingering issues with ongoing pain, weakness, double vision, and bladder and bowel control, which required her to self-catheterize and use suppositories.

In 2019, Sexton sued B. Braun for damages on a theory of strict product liability. She alleged, inter alia, that (1) the epidural instruments furnished by B. Braun and utilized in her epidural procedure on June 30, 2017, were "contaminated and in an unsterile condition"; and (2) B. Braun's defective manufacture and distribution of the contaminated instruments was a proximate cause of her injuries.[1]

The case proceeded to a five-day jury trial that concluded on April 22, 2022. The relevant facts established at the trial are as follows. B. Braun manufactures and distributes medical devices, including epidural kits used for laboring patients. In 2017, B. Braun manufactured custom epidural kits for Baptist Health. Lot #0061551535, a batch consisting of thirty-four cases of these custom epidural kits, was produced for Baptist Health on April 10–11, 2017. The epidural kits were assembled and sterilized at B. Braun's plant in Allentown, Pennsylvania, and were distributed from B. Braun's warehouse in Breinigsville,

---

[1]Sexton and her husband, Clay Sexton, brought the action as a married couple. Their complaint originally named additional defendants, including Baptist Health d/b/a Baptist Health Medical Center-Arkadelphia; Erik Adland, CRNA; Adland Anesthesia Services, LLC; and Diamond Risk Insurance, LLC. The Sextons later nonsuited their claims against the other defendants, leaving B. Braun as the single named defendant. At trial, the Sextons voluntarily dismissed additional claims against B. Braun for negligence and for punitive damages. The only remaining claims were based on strict product liability and Clay Sexton's loss-of-consortium claim, for which the jury ultimately awarded $0 in damages. The loss-of-consortium claim is not at issue in this appeal.

Pennsylvania. Medline, the supplier of the B. Braun kits to Baptist Health, shipped two of the cases from Lot #0061551535 to Baptist Arkadelphia. The remaining kits were either retained by Medline or were shipped to Baptist Little Rock.

B. Braun's epidural kits were assembled manually and hand packed with various components, including a needle and a catheter. The assembled kits were machine sealed and packed into shipping boxes. The boxes were taped shut and stacked on wooden pallets before going through B. Braun's sterilization process. Challenge organisms used to confirm sterilization were placed on the outside of the boxes. The pallets of stacked boxes were then sent through the sterilization process. The sterilization process involved the application of ethylene oxide gas, which was intended to penetrate through the shipping boxes and into the sealed epidural kits inside the boxes and sterilize the medical instruments contained in the kits. The shipping boxes were not opened again. Only the challenge organisms on the outside of the boxes were checked to confirm sterilization. According to B. Braun, once an epidural kit is sealed, "there is no way for something to get in." Contamination of an epidural kit, therefore, is possible only "either after the kit was opened or . . . potentially when [B. Braun] assembled it."

Erik Adland, a certified registered nurse anesthetist (CRNA) who had performed thousands of epidural procedures since 2009, placed Sexton's epidural utilizing one of B. Braun's custom epidural kits on June 30, 2017. According to Adland, Sexton's epidural procedure was routine, requiring only one attempt. Regarding the epidural kit utilized for Sexton's procedure, Adland said that "[e]verything in the kit was as should be, so [he] had

4

no reason to believe that the kit . . . [had] . . . anything wrong with it that [he] could tell." The kit was sealed, the packaging was not damaged, and nothing appeared to be out of place. Jonathan Severino, a quality-control director with B. Braun, agreed that the labeling on the epidural kit indicates sterility, and the CRNA who unseals and uses the B. Braun kit must proceed under the belief that everything in the kit is sterile.

The witnesses consistently testified that Sexton's epidural abscess was a very rare occurrence. CRNA Adland had never had another patient with an epidural abscess. He described Sexton's development of an epidural abscess as alarming, explaining that "this is a routine procedure that I've done several thousand times, never had a complication with, never had an issue with, and haven't had a complication or problem with since." Dr. Gandhi had never seen a case like this before. Dr. McCollum, too, had never had a patient develop an epidural abscess. Dr. Bray agreed that an epidural abscess is very rare—she's "never really heard of it." Dr. Michael Dogali, a neurosurgeon who testified for Sexton, testified that it is "extremely rare" to develop an epidural/intradural abscess due to an "epidural placement." He explained that epidural abscesses are nearly unheard of because of "the sterile techniques used by the medical providers that are placing the epidurals and . . . the reliance on the sterile packaging of sterile instruments, such as the needle and catheter[.]" He "could only find 12 cases in the literature that were similar to this case. And, you know, considering the thousands, literally, of these procedures that are done, it makes it a very, very rare event."

Both parties' experts agreed that Sexton's infection was introduced into her epidural and intradural space by a contaminated needle and/or catheter used during her epidural

procedure on June 30, 2017. Dr. Dogali opined that there was "no question" that Sexton's infection "was introduced into the epidural space by the needle and catheter from the B. Braun kit" since they were the only things "introduced into her spine that would explain the type of infection and the location of the infection." Dr. Amesh Adalja, B. Braun's infectious-disease expert, opined that "the MRSA got into Leah Sexton's epidural space by route of the catheter[.]" According to Dr. Adalja, "Were it not for the insertion of the epidural catheter, the MRSA would not have had access to her epidural space."

Dr. Dogali conceded that there was "no way to know for sure" exactly how the MRSA got on the needle and/or catheter. He explained, however, that for MRSA to "get onto hospital equipment" through exposure in the hospital environment, "you'd have to have a very specific methodology to make that kind of a transfer." While he agreed that it is possible for MRSA to "transfer from hospital surfaces onto the skin of a person," he testified that Sexton's medical records contained zero evidence of the presence of MRSA on her skin, or otherwise. He explained that the area "[w]here the needle was placed . . . is where you would expect [MRSA to be] if there was going to be contamination from the patient." He said that, according to the medical notes from Sexton's epidural procedure, "the skin was prepped and draped in the standard way"; the presence of MRSA on Sexton's skin, therefore, "would be highly unlikely." He further explained that "since preps usually are bactericidal, it would be almost medically improbable that the site of her lumbar puncture had MRSA on it." Additionally, he testified that, if Sexton's skin had been colonized with MRSA, you would

6

expect to find infection in an open wound; "it would've been more likely to show up in the . . . vaginal tear she had during her delivery."

Dr. Adalja, to the contrary, opined that the more likely source of contamination of the epidural instruments was through contact with a hospital surface as opposed to a flaw in manufacturing. He testified "that MRSA is an exceedingly common, hospital-acquired infection[;]. . . hundreds of thousands of these cases occur every day in hospitals." He explained that hospitals are always tracking MRSA to determine how many infections are occurring, looking for patterns and changes in patterns to detect outbreak. He offered several possible ways that MRSA might be transferred to sterile epidural instruments in the hospital environment: (1) contact with a contaminated hospital surface after the sealed epidural kit had been opened; (2) transfer from the CRNA's hands after the CRNA had touched a contaminated hospital surface; (3) transfer from the CRNA if the CRNA had been colonized with MRSA; and (4) transfer from the patient's skin if the patient had been colonized with MRSA. He concluded that Sexton's infection "was more an ordinary MRSA infection that occurs hundreds of thousands of times in hospitals every day in the United States."

Dr. Adalja's opinion relied primarily on the deposition testimony of Erin Armstrong, B. Braun's director of sterilization, citing her "very high confidence" that B. Braun's sterilization process resulted in sterile epidural kits released to Baptist Health because the reports generated by B. Braun did not reflect any concerns and because there were no other complaints made regarding other kits sterilized along with this custom lot manufactured for Baptist Health. Dr. Adalja, however, could point to no evidence supporting his opinion

7

other than noting that there was no evidence that the epidural kit had failed sterilization. He agreed that CRNA Adland followed a proper sterile technique in Sexton's case, and he admitted that he had no evidence or reason to believe that Adland did anything to contaminate the needle and/or catheter. Additionally, he confirmed that Sexton's medical records contained no indication that Sexton carried MRSA. He agreed that Sexton did not develop MRSA from the subsequent surgery, nor did she contract MRSA elsewhere from her delivery. According to John May, an epidemiologist at Baptist Health, an investigation confirmed that there was no outbreak of MRSA during the relevant period, and there was no reason to believe that the source of Sexton's infection came from Baptist Arkadelphia.

Contrary to Armstrong's deposition testimony, upon which Dr. Adalja's opinion relied, the testimony at trial showed that there were, in fact, other complaints made regarding B. Braun epidural kits produced in the same lot as the kit used in Sexton's epidural procedure. On July 8, 2017—the same morning of Sexton's emergency surgery—CRNA Brian Brown was administering epidurals on the labor and delivery floor at Baptist Little Rock. Early that morning, Brown took a cart with anesthesia supplies to room 7 to place an epidural for a patient. He opened a custom B. Braun epidural kit and "noticed a bug crawl out of the sterile kit." Brown explained that after he opens the sterile field of an epidural kit, his next step is placing his sterile gloves. In this case, he opened the kit and saw the insect crawling within the presumed sterile field before he had even placed his sterile gloves. This meant that the epidural tray was contaminated; it was no longer a sterile tray, so Brown threw that

8

tray away. Brown then got a new kit and placed the epidural for the patient in room 7 without incident.

After he left room 7, Brown returned to the anesthesia office and subsequently received a call to place an epidural in room 2. As with the patient in room 7, he used a B. Braun epidural kit with the patient in room 2. He placed the catheter in the patient's back through the epidural needle and removed the needle. Then, as he was preparing to administer a test dose of lidocaine, he picked up a vial of lidocaine from inside the sterile epidural tray and saw "another bug underneath that vial within the sterile kit." He confirmed that he had not moved the lidocaine vial before he pulled the vial up from a groove in the epidural tray and saw the insect underneath it. According to Brown, both insects were inside the sealed sterile field when he opened the epidural kits.

Brown said that in all his experience and training, he had never seen nor heard of insects in an epidural kit. He initially thought that he had used a contaminated tray to place the second patient's epidural, albeit unknowingly because the insect had been underneath the vial of lidocaine. He called for another CRNA, Jennifer Cooper, to come to room 2 and showed her the moving, live insect in the epidural kit, which, according to Brown, looked like the insect he had seen earlier that same morning in room 7.

Cooper took the tray containing the live insect to the anesthesia office while Brown finished with the patient in room 2. In the anesthesia office, Brown told Cooper that he had seen a similar insect in another epidural kit two hours prior. Brown and Cooper took a photograph and a video of the live insect in the epidural tray from room 2, making sure to

capture, among other things, the lot number for that epidural kit.[2] Then, they went back to room 7 and pulled from the trash can the epidural kit that Brown had thrown away after his first insect sighting earlier that morning. They determined that both insect-infested epidural kits were produced by B. Braun in the same batch—Lot #0061551535. They reported the information to Dr. Beth Ann Reed, the anesthesiologist working on the labor and delivery floor that day. After consulting an infectious-disease specialist, Dr. Reed notified the patient from room 2 about the incident and treated her prophylactically with antibiotics to prevent a possible infection from the use of contaminated epidural supplies.

That same morning, CRNA Cooper inspected the patient rooms, the anesthesia office, the storage room, and the anesthesia cart to determine whether there were any insects visible in the environment. She did not find any indication of insects in the environment. CRNA Brown confirmed that he had used the anesthesia cart throughout his shift and had not seen any insects in the cart or in the anesthesia office. John May, an epidemiologist at Baptist Health, also did not find any insects in the environment at Baptist Little Rock when he investigated the incident involving insect-contaminated epidural kits. May surmised that the insects either "were introduced during manufacture of the trays" or were brought into

---

[2]Dr. Ralph Williams, an entomologist who testified for B. Braun, said that the insects seen in the kits appeared to be some species of broad-nosed weevil. According to Dr. Williams, the insect in the photograph and video could have been from the Otiorhynchus genus, which includes the specific Otiorhynchus raucus genus that is found primarily in the Northeast part of the country.

the hospital in a sack of tomatoes he had seen in an anesthesia lounge during his investigation. He admitted, however, that his investigation began at least a few days after the insect sightings, and he did not know when the sack of tomatoes was placed in the anesthesia lounge. He also did not interview either CRNA Brown or CRNA Cooper about the insect sightings. Ultimately, neither May nor anyone on his team saw any insects on their inspection of the premises at Baptist Little Rock.

Dr. Reed informed Dr. Robert Overacre, the chair of the anesthesia department at Baptist Health, that the two insect-contaminated kits were from the same production lot. Baptist Health then undertook to identify and remove from circulation all B. Braun epidural kits from Lot #0061551535. Through that process, it was determined that only one other location in the Baptist Health system, Arkadelphia, had obtained epidural kits produced in this batch, and only one such kit had been used at Baptist Arkadelphia. Dr. Overacre then contacted CRNA Adland to determine whether the epidural kit used in Sexton's epidural procedure at Baptist Arkadelphia had been from Lot #0061551535. Adland referred to his records and confirmed that the epidural kit used on Sexton was, in fact, a B. Braun kit from Lot #0061551535. Once Adland realized that Sexton's epidural kit had been produced in the same batch as the insect-contaminated kits found at Baptist Little Rock, he notified Dr. McCollum, Sexton's obstetrician. Dr. McCollum passed the information on to Sexton "in the spirit of transparency" as a potential explanation of her very rare infection.

Baptist Health immediately reported to B. Braun that insects had been identified in two different B. Braun epidural kits from the batch produced in Lot #0061551535. Baptist

Health also reported to B. Braun that it had a patient who had developed an epidural abscess within the same timeframe as the incident involving the insect-contaminated epidural kits. On July 10, 2017, B. Braun generated a product complaint for bugs found "back to back" in "the sealed trays" from Lot #0061551535. At that time, Baptist Health was still in the process of determining how many facilities had received epidural trays from that batch and reported to B. Braun, "We are assessing possible injury. We do have one case of epidural abscess currently, which is extremely rare. Do not yet know if trays used in that case." Just days later, when asked whether "anyone confirm[ed] if any of the reported trays were used in the case where there was an epidural abscess[,]" Baptist Health reported, "No, although they did have 19 trays of the same lot the week after the bugs were found. I'm not sure we could ever confirm the lot used on the infected patient. Just based on numbers it is fairly likely the same lot." B. Braun ultimately decided that it was not required to report the insect-contamination issue to the FDA, reasoning that because the customer "did not know if this exact tray/batch was used on the patient [with a reported epidural abscess][,] . . . we cannot come to the conclusion that there is a connection between the tray (batch 0061551535) and the abscess."

Jonathan Severino, B. Braun's quality-control director, confirmed that B. Braun had the capability to perform testing for sterilization, bacteria, and microorganisms on the Lot #0061551535 epidural kits returned by Baptist Health in connection with its report of insect contamination and patient infection. B. Braun, however, did not perform any kind of testing, even though the bulk of the returned kits were unopened and "had good seals." B. Braun, moreover, was unable to test its own "retained sample" from Lot #0061551535—a

sample it was required by federal regulation to keep unopened and sterile for purposes of further investigation and annual visual inspections. According to B. Braun, it discovered that its "retained sample" from Lot #0061551535 "was previously pulled for evaluation and it was partially opened when we pulled it for testing" after receiving Baptist Health's contamination report. B. Braun, therefore, conducted only a visual evaluation of the kits Baptist Health returned, which "showed no signs of bugs or any other manufacturing or cosmetic defects."

Jennifer Ahearn, a consultant for manufacturers of FDA-regulated products, explained that a manufacturer would open its retained sample of a product only "if [they] had an investigation that calls for that." She testified that B. Braun had no documentation explaining the circumstances of the earlier evaluation of its retained sample from Lot #0061551535. According to Ahearn, "[e]ither there was a previous undocumented complaint about the lot number or someone improperly opened the retained sample." Ahearn confirmed that mistakes can be made in the manufacturing and sterilization processes relating to B. Braun's epidural kits.

According to Severino, in the five years preceding Sexton's lawsuit, B. Braun received 142 complaints of contamination and four complaints of patient infection relating to its products. Severino also confirmed that Baptist Health was not the first source of complaints about insects in B. Braun epidural trays. He said that B. Braun "occasionally" receives such complaints. With respect to the epidural kits produced in Lot #0061551535, B. Braun relied on its sterilization records, which, according to Severino, did not reveal any issue with the

sterilization process. Severino said that he did not know whether the sterilization process would or would not kill insects, but he conceded that any insects found within a sealed tray would have had to have been in the tray when the kit was assembled. He further conceded that the presence of insects inside epidural kits would have been potential evidence that the kits were contaminated.

Nevertheless, in 2019, when B. Braun generated another product complaint relating to Lot #0061551535 based on Sexton's claims, it investigated and documented the report as wholly separate from the 2017 insect-contamination reports involving the same lot. According to Severino, the prior complaint of insects in the sterile kits and Sexton's complaint of contaminated epidural instruments involved "separate failures" relating to two separate pieces of the manufacturing process. No information from the 2017 product complaint was used in the 2019 investigation, and no cross-reference was made in the 2019 product complaint to the previous reports of insects found in other Lot #0061551535 kits. Because the 2017 insect complaint was documented, coded, and handled separately from the 2019 complaint, B. Braun's own batch records did not reflect any prior allegations of contamination of the custom epidural kits. Further, because B. Braun had opened its retained sample even before the 2017 insect-contamination investigation and had opened all the kits returned by Baptist Health in 2017 without performing any physical testing on the kits, there was no additional testing or investigation available to confirm or reject Sexton's complaint.

14

After five days of trial, the jury returned a verdict on interrogatories, finding affirmatively "from a preponderance of the evidence that B. Braun Medical, Inc. supplied the epidural kit in a defective condition which rendered it unreasonably dangerous and resulted in damages to Plaintiff[.]" The jury found B. Braun liable in the amount of $200,000 for the damages Sexton incurred. The jury did not award Clay Sexton any damages on his loss-of-consortium claim. On May 4, 2022, the circuit court entered a judgment consistent with the jury's verdict. B. Braun filed a timely notice of appeal.

On appeal, B. Braun argues that the circuit court should have directed a verdict in its favor because Sexton (1) failed to introduce sufficient evidence to prove the existence of a defect at the time the epidural kit left B. Braun's control and (2) failed to introduce sufficient evidence to prove that the defect caused her injuries. Because we conclude that the jury's findings are supported by substantial evidence, we affirm.

## II. *Standard of Review*

Our standard of review of the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. *Nat'l Bank of Ark. v. River Crossing Partners, LLC*, 2011 Ark. 475, at 11, 385 S.W.3d 754, 761. Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion with reasonable certainty. *Miaoulis v. Toyota Motor N. Am., Inc.*, 2021 Ark. App. 19, at 4. If there is any substantial evidence to support the jury's verdict, we must affirm the circuit court's denial. *Campbell Soup Co. v. Gates*, 319 Ark. 54, 59, 889 S.W.2d 750, 753 (1994).

In reviewing the denial of a motion for directed verdict, it is not our place to try, or retry, issues of fact; rather, we simply review the record for substantial evidence to support the jury's verdict. *S. Farm Bureau Cas. Ins. Co. v. Allen*, 326 Ark. 1023, 1027, 934 S.W.2d 527, 529 (1996). Since it is within the province of the jury to believe one party's theory over the other party's version, we consider only whether there is any substantial evidence to support the jury's findings. *Petrus Chrysler-Plymouth v. Davis*, 283 Ark. 172, 174, 671 S.W.2d 749, 751 (1984). In doing so, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf the judgment was entered. *Campbell Soup Co.*, 319 Ark. at 59, 889 S.W.2d at 752–53. A motion for directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach a different conclusion. *River Crossing Partners, LLC*, 2011 Ark. 475, at 11, 385 S.W.3d at 761. *See also Hankook Tire Co., Ltd. v. Philpot*, 2020 Ark. App. 316, at 20, 603 S.W.3d 614, 626 ("When the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented.").

III. *Discussion*

A. Product Defect

B. Braun first argues that there was insufficient evidence from which the jury could find the existence of a defect in the epidural kit when it left B. Braun's Pennsylvania plant in April 2017. More specifically, B. Braun contends that Sexton failed to present direct proof that the epidural kit was defective because of a manufacturing flaw and failed to negate the other possible causes of the kit's defective condition not attributable to B. Braun. Because

16

the jury could reasonably infer the existence of a defect when the epidural kit left B. Braun's control, we find no error in the circuit court's denial of B. Braun's directed-verdict motion.

In relevant part, the plaintiff in a products-liability action has the burden of proving (1) that the product was supplied by the manufacturer in a defective condition that rendered it unreasonably dangerous; and (2) that the defective condition was a proximate cause of the plaintiff's damages. *See* Ark. Code Ann. § 16-116-101(a) (Repl. 2016) (providing elements required to establish strict liability on the part of product supplier). Generally, a plaintiff must prove that the product in question was in a defective condition when it left the hands of the particular seller. *Campbell Soup Co.*, 319 Ark. at 59, 889 S.W.2d at 753. A plaintiff, however, is not required to prove a specific defect "when common experience teaches the accident would not have occurred in the absence of a defect." *Higgins v. Gen. Motors Corp.*, 287 Ark. 390, 392, 699 S.W.2d 741, 743 (1985). In the absence of direct proof that the product is defective because of a manufacturing flaw, it is sufficient if the plaintiff "negates other possible causes of failure of the product not attributable to the defendant," thus raising a reasonable inference that a defective condition existed while the product was still in the defendant's control. *Madden v. Mercedes-Benz USA, Inc.*, 2016 Ark. App. 45, at 5, 481 S.W.3d 455, 459. Such proof may be by circumstantial evidence. *Higgins*, 287 Ark. at 392, 699 S.W.2d at 743. The plaintiff is not required to eliminate all other possibilities—and she need not prove her case beyond a reasonable doubt—but she must present evidence from which a jury can conclude that it is more probable than not that this occurred. *Madden*, 2016 Ark. App. 45, at 5, 481 S.W.3d at 459.

17

B. Braun does not dispute the existence of a defect in the epidural kit at the time that Sexton's epidural was placed. Indeed, both parties' experts agreed that the only way for MRSA to have been introduced into the epidural space within Sexton's spine was through the insertion of a contaminated needle and/or catheter during her epidural procedure. B. Braun also does not contend that the product defect—bacterial contamination of the needle and/or catheter—might have occurred at some point during distribution after the epidural kit left B. Braun's plant in April 2017 and before it was unsealed and opened during Sexton's epidural procedure on June 30, 2017. Accordingly, we find B. Braun's reliance on *Campbell Soup Co.* misplaced.

In *Campbell Soup Co.*, the plaintiff purchased Campbell Soup manufactured Ramen noodle packets and later discovered that the noodle packets were infested with Trogoderma beetle larvae. 319 Ark. at 60, 889 S.W.2d at 753. At trial, the plaintiff and her mother "testified that live and dead insect larvae were found among the cooked noodles, . . . [y]et no other testimony established a direct link to Campbell Soup Company apart from identifying it as the manufacturer." *Id.* at 60, 889 S.W.2d at 753-54. In its opinion, the Arkansas Supreme Court noted that "the mere fact that the larvae were present in the packaged and prepared product is simply not enough to assign liability to the manufacturer. It must be shown that the product was in a defective condition at the time it left the care, custody, and control of Campbell Soup." *Id.*, 889 S.W.2d at 753. The court ultimately concluded that the plaintiff's evidence "did not show that the product in question was in a defective condition

18

when it left Campbell's hands; nor was there sufficient evidence to negate the existence of other possibilities of sources of contamination." *Id.* at 62, 889 S.W.2d at 754.

In *Campbell Soup Co.*, as B. Braun notes, there was testimony from a research microbiologist with the National Food Processors Association who opined that the larvae "would not be able to survive [the Ramen noodle manufacturing process]" but "can get into [an unopened package of noodles] in less than an hour if the package is in close proximity to beetle infestation." *Id.* at 61, 889 S.W.2d at 754. As our supreme court said, "Such testimony, of course, is properly subject to evaluation by the jury in its deliberations[.]" *Id.* In that case, rather, "the key factor [was] the objective chronology of the manufacture, shipment, distribution, and sale of the particular packet of noodles infested with insect larvae." *Id.* After examining a list of critical dates and events, the court held that substantial evidence did not support the jury's finding "that the insect larvae were present in the noodles when the package left the Campbell Soup Company plant." *Id.* The court reasoned as follows:

> More than a month elapsed between the dates of manufacture and purchase, during which period the product was transported by unnamed carriers from the plant in California to an intermediate storage site and then to the distributor in Missouri, who delivered it to Warehouse Foods in Searcy, where it was in stock for approximately one week prior to [the plaintiff's purchase on] November 4, 1991. The larvae could have entered the packages at any point beyond manufacture—*i.e.*, during shipment, storage, or display on the shelves of the store. (Our standard of review obliges us to discount the possibility that the packages could have become infested under the consumer's control.)

*Id.* at 62, 889 S.W.2d at 754.

In this case, unlike in *Campbell Soup Co.*, B. Braun did *not* contend that its epidural kit could have become contaminated "at any point beyond manufacture[.]" *Id.* To the contrary, B. Braun maintained that "nothing could have gotten in" the epidural kit after it was sealed during manufacture. B. Braun's theory thus narrowed the window of possibility for a failure in the product "beyond manufacture" to a period of roughly ten minutes between the time the epidural kit was unsealed and opened and the time the kit's needle and/or catheter was inserted into Sexton's spine. The testimony of Dr. Adalja opining that contact with a hospital surface, occurring within this window, was the more likely source of contamination as opposed to a flaw in manufacturing is precisely the kind of evidence that "*is properly subject to evaluation by the jury in its deliberations*[.]" *Campbell Soup Co.*, 319 Ark. at 60, 889 S.W.2d at 753 (emphasis added).

In this case, multiple medical professionals testified that a patient developing an epidural abscess after receiving an epidural during labor is an extremely rare occurrence. Dr. Dogali found only twelve such cases in the medical literature—a far cry from the "hundreds of thousands of these cases [that] occur every day in hospitals" cited by Dr. Adalja. The reason that epidural abscesses are virtually unheard of, as Dr. Dogali explained, is because epidurals are administered under a controlled, standardized sterile process. Erik Adland, the CRNA who administered Sexton's epidural, described in detail the steps he took to maintain sterility during the procedure. These steps, among others, included (1) washing his hands; (2) putting on gloves before helping the patient into position; (3) removing gloves to remove the nonsterile top part of the epidural kit; (4) putting on sterile gloves; (5) cleaning the bedside

tray with an antiseptic wipe before placing the epidural tray on it; (6) keeping any items that were not from the epidural kit separate to ensure there was no contact with kit components; and (7) cleaning the patient's back with antiseptic solution from the kit three times in a circular motion from the center point of where the catheter would be inserted and outward. Adland testified that he performed Sexton's epidural procedure wearing sterile gloves, a face mask, a surgical cap, and a gown. Dr. Dogali and Dr. Adalja both agreed that Adland properly performed the procedure and did not deviate from the standard sterile process.

Dr. Adalja's opinion relied on an absence of evidence in B. Braun's own records indicating any issue with sterilization for Lot #0061551535, and he could say only that inadvertent contact between medical instruments and hospital surfaces is possible. He conceded that there was no evidence of contact between the epidural instruments and any hospital surface during Sexton's procedure. CRNA Adland unsealed and opened the epidural kit at Sexton's hospital bedside right before he placed the epidural and kept the kit "above waist level for the entire procedure." Additionally, Baptist Health's investigation into the rare occurrence of Sexton's epidural abscess found (1) no evidence of MRSA relating to Sexton; (2) no evidence of MRSA relating to CRNA Adland; (3) no evidence of MRSA relating to any of the numerous procedures, surgical and otherwise, in which Adland participated during the relevant time period; and (4) no evidence of MRSA in Sexton's hospital room and no significant presence of MRSA on a larger scale in the hospital environment at Baptist Arkadelphia during the relevant time period.

21

Jonathan Severino, B. Braun's quality-control director, testified that B. Braun's epidural kits undergo a rigorous, FDA-approved sterilization process. This sterilization process, according to Severino, is validated with the use of challenge organisms that are confirmed to be destroyed and that are more difficult to kill than MRSA bacteria. While Severino said that "the seal on the kit means that there is sterility after you've gone through sterilization," he also confirmed that "*[y]ou can seal the kit and never put it through sterilization and therefore it would not be sterile*." (Emphasis added.)

The jury, moreover, heard evidence that B. Braun had received additional reports of contamination in other epidural kits produced in Lot #0061551535. Baptist Health reported to B. Braun that, on July 8, 2017, live insects were identified in two sterile epidural trays from Lot #0061551535 while Sexton was in the hospital with a rare epidural abscess she developed after receiving an epidural utilizing a tray from the same lot. B. Braun had "on occasion" received similar reports by customers concerning insect-contaminated "sterile" products. B. Braun produced the epidural kits in Lot #0061551535 at its plant in Allentown, Pennsylvania. The kits were sealed on April 10, 2017, and finished on April 11, 2017. According to B. Braun, "nothing could have gotten in" after the kits were sealed. CRNA Brown confirmed that the epidural kits were sealed and undamaged when he opened them and discovered the live insects inside on July 8.

According to Dr. Williams, an entomologist, the larval and pupa stages for the insects could last 90–140 days. Dr. Williams could not rule out the possibility that the insects were of the Otiorhynchus raucus genus—a species of weevil found primarily in the Northeast. He

testified that a weevil of this particular species would come out of the larval and pupa stages and "be a live insect somewhere around three months or so[.]"

This evidence shows how the insects could have made their way into two different Lot #0061551535 epidural kits before the kits were sealed during the manufacturing process at B. Braun's plant in Pennsylvania and either somehow survived B. Braun's sterilization process or, as Severino's testimony suggested, the epidural kits in Lot #0061551535 were sealed but never made it through the sterilization process. In short, there was some evidence of a possible manufacturing flaw with respect to production of the epidural kits in Lot #0061551535.

Further, it was within the province of the jury to weigh the conflicting expert opinions as to the cause of contamination in the epidural kit used in Sexton's procedure. *See River Crossing Partners, LLC*, 2011 Ark. 475, at 11, 385 S.W.3d at 761 (holding that a jury question is presented when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach a different conclusion). Here, there simply was no evidence of anything that might have contaminated the needle or catheter in the minutes that elapsed from the time CRNA Adland unsealed and opened the epidural kit and when he inserted the needle and catheter into Sexton's spine. While there was conflicting testimony as to when and how the epidural kit became contaminated with MRSA, the jury could reasonably infer from the evidence that the defective condition probably existed before Adland unsealed and opened the kit. Viewing the evidence in the light most favorable to Sexton, we conclude

that substantial evidence supports the jury's finding. Accordingly, we hold that the circuit court did not err by denying B. Braun's motion for a directed verdict.

## B. Proximate Cause

B. Braun also argues that Sexton failed to establish any link between the epidural kit and her injuries. But, as mentioned previously, all the experts agreed that a contaminated needle and/or catheter from the B. Braun epidural kit caused the MRSA infection that developed in Sexton's spine. Because substantial evidence supports the jury's causation finding, we find no error in the circuit court's denial of B. Braun's directed-verdict motion.

Proximate cause is usually an issue for the jury to decide, and when there is evidence to establish a causal connection between the conduct of the defendant and the damage, it is proper for the case to go to the jury. *Miaoulis*, 2021 Ark. App. 19, at 5. Proximate cause is defined as that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *Bank of the Ozarks, Inc. v. Ford Motor Co.*, 2020 Ark. App. 231, at 11, 599 S.W.3d 718, 724. Proximate cause may be proved by circumstantial evidence, so long as there is evidence that would tend to eliminate other causes that may fairly arise from the evidence, and the jury is not left to speculation and conjecture in deciding between two equally probable possibilities. *Miaoulis*, 2021 Ark. App. 19, at 5. It is enough that the plaintiff introduced evidence from which reasonable persons might conclude that it is more probable than not that the event was caused by the defendant. *Id.* at 5–6.

Here, Sexton presented evidence that but for the contaminated needle and/or catheter from the B. Braun epidural kit, she would not have suffered the injuries related to her epidural abscess. Both parties' experts testified that the only way MRSA could have gotten into Sexton's epidural space and caused the infection was through the contaminated needle and/or catheter inserted into her spine during the epidural procedure. Accordingly, the jury could, and did, reasonably conclude that the defective condition of the epidural kit and, more specifically, the contaminated epidural instruments contained in the kit were the proximate cause of Sexton's damages. Viewing the evidence in the light most favorable to Sexton, substantial evidence supports the jury's causation finding. Accordingly, we hold that the circuit court properly denied B. Braun's motion for a directed verdict.

Affirmed.

GLADWIN and THYER, JJ., agree.

*Wright, Lindsey & Jennings LLP*, by: *Gary D. Marts, Jr.*, for appellant.

*Appellate Solutions, PLLC*, by: *Deobrah Truby Riordan*; *Law Office of Travis Berry*, by: *Travis Berry*; and *Trammell Piazza Law Firm*, by: *Melody H. Piazza* and *M. Chad Trammell*, for appellee.